Filed 10/3/18; pub. order 10/12/18 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | D073561 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. EJ3633B/C) |
| Plaintiff and Respondent, | |
| v. | |
| C.S. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Ana L. Espana, Judge. Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant C.S.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant T.F.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

This appeal arises from the juvenile court's selection of a tribal customary adoption as the permanent plan for minors A.S. and E.S. and the corresponding award of full faith and credit to the tribal customary adoption order.  C.S. (Father) and T.F. (Mother) appeal the court's orders, contending that their due process rights were violated by the failure of the tribe to consider evidence from the parents in developing a tribal customary adoption order and by the court's exclusion of evidence at the Welfare and Institutions Code section 366.26 hearing.  For the reasons explained below, we affirm the juvenile court's orders in their entirety.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2013, the San Diego County Health and Human Services (the Agency) removed minor Aa.S. from Mother and Father's home after Aa.S. witnessed a domestic violence incident between her parents.[1]  At some point, Aa.S. was returned to Mother's custody.  A.S. was born in October 2014 to Mother and Father.  Following another domestic violence incident in January 2015, Aa.S. and A.S. were removed from Mother's home.  The Agency filed a Welfare and Institutions Code section 300[2] petition regarding

---

[1]    Aa.S. is the older sibling of A.S. and E.S.  Jurisdiction over Aa.S. initially prompted the Agency's involvement with the family.  However, Aa.S. is not the focus of this appeal.

[2]    All section references are to the Welfare and Institutions Code unless otherwise indicated.

A.S. on February 4, 2015, following her exposure to violent confrontations between the parents involving the use of physical force. At the related detention hearing, the court found C.S. to be A.S.'s presumed father, issued a permanent restraining order against him, and returned Aa.S. and A.S. to Mother's custody.[3]

A. *Removal from Father's Custody*

At the April 17, 2015 contested adjudication and disposition hearing, the court sustained the section 300 petition and made a true finding that A.S. was a person as described under section 300, subdivision (b). The court removed A.S. from Father's custody under section 361, subdivision (c) and placed A.S. with Mother.[4]

On December 4, 2015, Mother filed a section 388 petition to terminate the restraining order against Father. After hearing arguments from Mother, Father, and the Agency, the court denied Mother's motion. In January 2016, the court modified the restraining order to allow peaceful contact between the parents outside the children's presence and at medical and school appointments and public events, but continued to prohibit Father from being at Mother's home while the children were present. The court continued A.S.'s placement with Mother, and ordered family maintenance services for

---

[3] Father appealed this decision. We dismissed the appeal after his attorney submitted a *Sade C.* brief (*In re Sade C.* (1996) 13 Cal.4th 952).

[4] Father appealed this decision. The remittitur issued August 26, 2015 after counsel for Father submitted a *Sade C.* brief.

Mother and enhancement services for Father. The court ordered Father to follow his case plan, attend A.A. meetings, and participate in a domestic violence class.[5]

B. *Removal from Mother's Custody*

E.S. was born to Mother and Father in March 2016. Mother did not inform the hospital of the restraining order, and Father was present at the birth; he also visited throughout the hospital stay. When confronted by the social worker later about Mother and Father being together in the presence of the children, the parents acknowledged the existence of the restraining order, but maintained that it did not prohibit their having contact with each other while the children were present.

Minors' counsel filed a section 388 petition on May 10, 2016, alleging that the parents were out of compliance with the restraining order. At a special hearing that day, the court ordered that A.S. be detained outside Mother's home. The Agency filed a section 300 petition on May 13, regarding E.S., and the court issued a protective custody warrant the same day. On May 16, at the detention hearing for E.S., the court found C.S. to be the presumed father and ordered E.S. detained outside her parents' homes. The Agency also filed a section 387 petition regarding A.S. on May 20, alleging that Father had visited the home intoxicated, while the children were present, and Mother had called the police because of Father's belligerence. At the detention hearing for A.S. on May 23, 2016, the court found that A.S.'s removal was necessary.

---

[5]    Father appealed these orders because the court continued jurisdiction. After Father's attorney filed a *Sade C.* brief, we dismissed the appeal.

4

C. *Indian Child Welfare Act*

The contested adjudication and disposition hearing for both children was initially set for July 15, 2016. However, the hearing was repeatedly continued to address claims of Indian heritage, pending the outcome of Indian Child Welfare Act (ICWA) notifications. In December 2016, the Mesa Grande Band of Mission Indians (the Tribe) expressed interest in intervening in the case, and the Tribe formally sent a letter in January 2017 that stated that the Tribe "recognize[d] and consider[ed] each child . . . be afforded the protections under 'Indian Child' under ICWA."[6] Mother and Father continued to live together throughout this time, at least sporadically.

At the February 3, 2017 contested adjudication and disposition hearing, the court found that the minors were Indian children as defined in the ICWA, 25 U.S.C. section 1903(4). Because the children were under the age of three at the time they were removed from their parents' custody, the parents were given six months to make substantive progress in their plans.[7]

D. *Termination of Reunification Services*

On September 5, 2017, the court found by a preponderance of the evidence that returning the children to their parents would create a substantial risk of detriment to the

---

6 The letter is dated January 11, 2016. However, that date appears to be erroneous. The Agency's January 30, 2017 addendum report notes the notice was sent to the Mesa Grande Band of Mission Indians on November 14, 2016, after the date of the letter. Additionally, the Agency did not receive the letter via facsimile until January 23, 2017, and the letter identifies E.S.'s date of birth in March 2016, also after the date of the letter.

7 The parents appealed the court's orders, and we dismissed their appeals after the parents' attorneys filed *Sade C.* briefs.

children's physical and emotional well-being.  The court also found that there was not a substantial probability that the children would be returned to their parents' physical custody within an extended period of time.  The court ordered reunification services terminated.  The court also ordered permanent placement under section 361.2, subdivision (e) and found by clear and convincing evidence that the Agency had complied with the case plan to make active efforts to return the children to a safe home, as required by section 361.7.  The court reaffirmed the terms of the restraining order and continued visitation between the minors and the parents.  The court set a hearing date to select a permanent placement plan for the minors, as required by section 366.26.

E. *Section 366.26 Report*

In its January 3, 2018 section 366.26 report, the Agency recommended tribal customary adoption as the permanent plan for the children, with placement with the current caregivers, with whom both children had been residing, together with their older sister, since January 21, 2017.  The Tribe agreed.  In this report, the Agency noted that Mother had visited the children consistently and that Father had, as well, until recently. The Agency commented that the children "share a good relationship with their parents" and "appear comfortable at visits"; it also noted that the children "have no issue separating when visits are over," and stated that the children have a special need for permanency.

F. *Mother's Section 388 Petition*

On February 2, 2018, Mother filed a section 388 petition pertaining to both children.  Mother attached to the petition information about her therapy, her lease, and

6

visitation narratives. Mother sought six more months of services. At the February 7, 2018 hearing on this request, the court found that Mother had not met her prima facie burden.

G. *Section 366.26 Hearing*

In the February 16, 2018 addendum report, the social worker reported that A.S. did not want to go with the social worker to visit her father, and that when she returned from those visits, she exhibited behavioral issues. The report also noted that Father was appropriate in his visits with the children, but sometimes arrived unprepared, gave the children sugary snacks, or was distracted from the children by communications with professionals involved in the case. The report stated that the Agency's social worker had been informed by the tribal social worker that the tribal social worker had spoken with Mother about the Tribe's adoption recommendation. The Agency continued to recommend tribal customary adoption, noting that the parents had not shown the ability to maintain a safe home environment, free from domestic violence.

Prior to the contested section 366.26 hearing, minors' counsel filed a motion in limine seeking to narrow the issues to be determined at the hearing. The motion argued that in the case of an Indian child, the issues that the juvenile court is to consider at the 366.26 hearing are limited to adoptability and whether tribal customary adoption would be detrimental to the minors.

Though Mother's attorney sought some leeway in the permissible scope of Mother's testimony so that Mother would have the opportunity to express her feelings and discuss how visitation was going, both Mother's attorney and Father's attorney concurred

7

with the analysis in the motion in limine, confirming that the law requires a showing of detriment to the children from the selection of tribal customary adoption as the permanent plan in order to render tribal customary adoption inappropriate. Father's attorney told the court that he believed the motion in limine accurately summarized the applicable law.

Mother testified at the February 16, 2018 hearing that she had not been given an opportunity to provide information to the Tribe regarding her progress with her services. She explained that she wanted the Tribe to know that she had completed domestic violence classes and therapy, and that she had healed. She also testified that she opposed the tribal customary adoption because she wanted to raise her children herself. She told the court that she was living on her own and maintained that she had learned "red flags" and other warning signs from participating in therapy and completing domestic violence classes. She testified that she had left four messages for the Tribe after she received the tribal customary adoption proposal, but had not been contacted by anyone from the Tribe. On cross-examination, Mother denied that she had spoken about A.S. and E.S. with the tribal social worker in October 2017. The court concluded that testimony about visitation, Mother's progress in services, and her bond with the children was not relevant to the issues to be determined at the hearing.

Father's attorney argued that a tribal customary adoption would be detrimental to the children because it would impede their visitation with Father. Father's attorney agreed that a tribal customary adoption would mean that future visitation with the parents would be decided by the Tribe.

When Father testified, the court explained that it would allow Father the opportunity to say what he wished, but would not permit a lot of detail about visitation. Father testified regarding his visitation with the minors, generally, and stated that he had had no contact with the Tribe, despite having tried to get in touch with the tribal social worker.[8]  Contradicting the parents' testimony, Karen Kolb, the Tribe's representative, reported that the phone calls Father referenced were to the tribal hall or tribal offices, but that her office was the one that handled ICWA cases.  She testified that she "had several conversations [with Father] since 2017 when [the Tribe] first took the case.  There [have] been numerous phone calls.  Some of them have lasted up to 45 minutes."  She also said, "[W]e have had many visitations.  We've had many consultations.  I just looked at my notes and filled up [*sic*] a whole page of consultations, visits, phone calls, home visits, consultations with the Indian specialist, and foster home parent conversations at court."  The court received in evidence the Agency's reports, without objection; these reports included information about visitation, bonding, and attachment.[9]  The court commented that much of the information was not relevant.

---

[8]     Counsel for Father also commented in his closing argument that the power to control visitation under the terms of the tribal customary adoption order would be delegated to the caregivers, and he noted that in the sibling's case, that had resulted in no visitation or phone calls between the child and Father.  "[S]ection 366.24, subdivision (c)(10) requires the [tribal customary adoption] order to address the issue of visitation, but it does not guarantee birth parents a right of visitation."  (*In re Sadie S.* (2015) 241 Cal.App.4th 1289, 1302 (*Sadie S.*).)

[9]     The reports included general information about the bond between the minors and their parents, but there was no bonding study.

9

The court stated that it had reviewed the reports that it had received and had considered the testimony and arguments of the parties before arriving at a decision. The court noted that the parents had received more than 44 months of services and that neither parent had adequately addressed the protective issues raised by the case. The court found that A.S. and E.S. were specifically and generally adoptable Indian children and that the social worker had consulted with the Tribe, which had elected a permanent plan of tribal customary adoption for the children. The court received the Tribe's Tribal Customary Adoption Order and afforded it full faith and credit.

Mother and Father separately appealed these orders from the section 366.26 hearing. We affirm.

DISCUSSION

A. *Tribal Customary Adoption*

While statutory goals demonstrate a preference for family preservation for dependent children as a first priority, legislative policy maintains that, "reunification services should be 'time-limited' in favor of permanency planning at the earliest appropriate time." (*In re Heather B.* (1992) 9 Cal.App.4th 535, 541.) When reunification efforts fail, the court terminates reunification efforts and sets the matter for a hearing under section 366.26 for the selection and implementation of a permanent plan. (*In re Celine R.* (2003) 31 Cal.4th 45, 52 (*Celine R.*).) At that point, the focus becomes the best interests of the child, with the goal of protecting a child's right to a stable, permanent home in which the caretaker can make a full emotional commitment to the

10

child. (*Sadie S., supra,* 241 Cal.App.4th at p. 1303; *In re H.R.* (2012) 208 Cal.App.4th 751, 759 (*H.R.*).)

The general statutory preference is termination of parental rights and placement for adoption (§ 366.26, subd. (b)(1)), but "[i]n 2010, legislation was enacted establishing 'tribal customary adoption' as an alternative permanent plan for a dependent Indian child who cannot be reunited with his or her parents. Tribal customary adoption is intended to provide an Indian child with the same stability and permanency as traditional adoption under state law without the termination of parental rights, which is contrary to the cultural beliefs of many Native American tribes." (*H.R., supra,* 208 Cal.App.4th at p. 755; § 366.24, subd. (a) [adoption through custom, traditions, or law of an Indian child's tribe does not require termination of parental rights].)

The dependency court has discretion to select the most appropriate permanent plan. (*H.R., supra,* 208 Cal.App.4th at pp. 764-765.) If recommended by a child's tribe, tribal customary adoption is the preferred permanent plan. (*Id.* at pp. 761, 763-764 ["the default in the case of an Indian child is tribal customary adoption"]; § 366.26, subds. (b), (c)(1), & (e)(2).) Any party may contest selection of tribal customary adoption as the permanent plan, but the parents do not have to agree to tribal customary adoption in order for its selection to be proper. (*H.R.,* at p. 766; § 366.24, subd. (c)(11); *Sadie S., supra,* 241 Cal.App.4th at pp. 1302-1303.) A tribal customary adoption plan is the most appropriate permanent plan absent "evidence of countervailing detriment to the minor that the court, in its discretion, concludes would result from this form of adoption." (*H.R.,* at p. 764.)

11

In 2010, the Department of Social Services published All-County Letter (All-County Letter) No. 10-47 to provide guidance on tribal customary adoptions.[10] According to the All-County Letter, the juvenile court is not required to afford full faith and credit to the tribal customary adoption order if the order violates generally accepted California public policy, there is fraud, the entity that issued the order lacked authority to do so, the order does not provide for due process, or it offends a strongly held public policy. (California Department of Social Services, All-County Letter No. 10-47, § 10.4, available at <http://www.cdss.ca.gov/lettersnotices/entres/getinfo/acl/2010/10-47.pdf> [as of October 3, 2018] archived at <https://perma.cc/E2FP-HWDC> (All-County Letter).) However, declining to afford full faith and credit to the order does not prevent a tribal customary adoption from occurring. If the court declines to afford full faith and credit to the order, the parties must address and attempt to resolve the issues preventing affording the order full faith and credit. (*Id.* at § 10.5.) If the issues cannot be resolved, then the court may determine a different permanent plan for the Indian child. (*Ibid.*)

The Welfare and Institutions Code provides that when a tribal customary adoption has been selected as the permanent plan, "the court, upon receiving the tribal customary adoption order will afford the tribal customary adoption order full faith and credit to the same extent that the court would afford full faith and credit to the public acts, records,

_____

10     The All-County Letter was drafted pursuant to Section 26 of AB 1325, which states that " 'the Department of Social Services may implement and administer the applicable provisions of this act through all-county letters or similar instruction from the director until such time as the regulations are adopted.' " (All-County Letter, p. 2, fn. 1.) We discuss the weight of the All-County Letter *post.*

12

judicial proceedings, and judgments of any other entity."  (§§ 366.24, subd. (c)(6); 366.26, subd. (e)(2).)

B.  *Standards of Review*

We review interpretations of law de novo.  (*In re Hogan* (1986) 187 Cal.App.3d 819, 822.)  We review the dependency court's selection of a tribal customary adoption under an abuse of discretion standard.  (*H.R., supra,* 208 Cal.App.4th at p. 765.) "Discretion is delimited by the applicable legal standards, a departure from which constitutes an 'abuse' of discretion."  (*People v. Harris* (1998) 60 Cal.App.4th 727, 736 (*Harris*).)  Thus, a court abuses its discretion if it applies an incorrect legal standard. (*In re Shannon M*. (2013) 221 Cal.App.4th 282, 289 (*Shannon M.*).)

C.  *Due Process Rights*

The parents contend that the court's selection of tribal customary adoption as the children's permanent plan violated their due process rights because they were denied the opportunity to present evidence to the Tribe regarding the children's best interests.  We disagree.

1. *Legal principles*

"Different levels of due process protection apply at different stages of dependency proceedings."  (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 733.)  Because the focus shifts from the parents' interest in reunification to the child's need for permanency and stability after reunification services are terminated and a section 366.26 hearing is set, parents do not have unfettered due process rights.  (*Ibid.*)  Due process requires "a 'hearing appropriate to the nature of the case.' " (*In re James Q.* (2000) 81 Cal.App.4th

13

255, 265 (*James Q.*), quoting *Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 313.) Although due process is "a flexible concept which depends upon the circumstances and a balancing of various factors," it generally requires the right to present relevant evidence. (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817.) This means parents are entitled to be heard in a meaningful manner. (*James Q.,* at p. 265; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 412 [parents whose rights will be impacted entitled to be heard].)

Additionally, section 366.24 sets out requirements that must be met before the juvenile court may afford a tribal customary adoption order full faith and credit. One of these requirements is set forth in subdivision (c)(7), which states, "The child, birth parents, or Indian custodian and the tribal customary adoptive parents and their counsel, if applicable, may present evidence to the tribe regarding the tribal customary adoption and the child's best interests." (See *Sadie S., supra,* 241 Cal.App.4th at p. 1302.) At issue here is at what point in the process the parents are to be given the opportunity to present evidence to the tribe.

2. *Timing of parental input to tribe*

Section 366.24, subdivision (c)(6) states, "If the tribe identifies tribal customary adoption as the permanent plan for the Indian child, the court may continue the selection and implementation hearing governed by Section 366.26 for a period not to exceed 120 days to permit the tribe to complete the process for tribal customary adoption and file with the court a tribal customary adoption order evidencing that a tribal customary adoption has been completed." While continuing the hearing for this purpose appears to

14

be permissive,[11] section 366.26 indicates that the court determines whether to afford the tribal customary adoption order full faith and credit at the *continued* selection and implementation hearing. (§ 366.26, subd. (b)(2).) Taken together, the statutes contemplate a two-part selection and implementation hearing. At the initial hearing, the court selects tribal customary adoption as the permanent plan; at the continued hearing, the court addresses the specific tribal customary adoption order, and determines whether to afford it full faith and credit.[12] (§§ 366.26, subd. (b)(2); 366.24, subd. (c)(6); see *B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 189 [courts harmonize the various parts of a statutory enactment].)

Similarly, the All-County Letter describes a two-part hearing for tribal customary adoptions. If reunification services are terminated, once the tribe and social worker indicate that tribal customary adoption is the preferred plan, the court considers tribal customary adoption as the permanent plan at the section 366.26 hearing. (All-County Letter, §§ 1.6(b) & 1.6(e).) If the court determines that tribal customary adoption is the appropriate permanent plan, the court continues the hearing for the tribe to conduct its part of the section 366.24 process. (All-County Letter, § 1.6(e).) Both the statutes and the All-County Letter state that the tribe must file the tribal customary adoption order no

---

[11] The word "may" is treated as permissive "[a]bsent indicia of a contrary legislative intent." (*In re J.N.* (2006) 138 Cal.App.4th 450, 457, fn. 4.)

[12] Our statutory analysis is consistent with existing case law, which states, "[a]t the selection and implementation hearing the parties may present evidence to the Tribe on the TCA and the minor's best interest." (*In re I.P.* (2014) 226 Cal.App.4th 1516, 1526; *In re A.M.* (2013) 215 Cal.App.4th 339, 348.)

less than 20 days before the continued hearing.  (§§ 366.26, subd. (b)(2); 366.24, subd. (c)(6); All-County Letter, § 1.6(e).)

The All-County Letter indicates that the parents' opportunity to present evidence to the tribe regarding the tribal customary adoption order and the child's best interests is at the continued hearing.  (All-County Letter, § 1.6(e)(3)(i).)  The statutes do not state at what point in the process the parents must be given the opportunity to provide information to the tribe regarding tribal customary adoption and the child's best interests.  However, case law suggests this should occur *before* the tribe has completed the tribal customary adoption order, not, as the All-County Letter provides, at the hearing granting the order full faith and credit.  (See, e.g., *Sadie S., supra*, 241 Cal.App.4th at p. 1302.)

The timing of parental input as set forth in the All-County Letter is problematic because it would allow for parental input only *after* the tribe has developed and submitted the tribal customary adoption order.  While we recognize that a court is not required to terminate parental rights when it adopts a tribal customary adoption as the permanent plan (§§ 366.24, subd. (a); 366.26, subd. (c)(1)(B)(vi)), because a tribal customary adoption order can effectively eliminate all parental contact and decision making, as is the case here, parents' due process rights must be protected.  Waiting until the hearing at which the court is poised to grant the tribal customary adoption order full faith and credit to allow the parents to provide input deprives them of any meaningful opportunity to be heard by the tribe.  Instead, as the statutory scheme contemplates, parents must have the opportunity to communicate with the tribe *before* it adopts the tribal customary adoption

16

order so that the tribe may consider the parents' evidence in developing the order and completing the tribal adoption.[13]

### 3. *Significance of All-County Letter No. 10-47*

"The degree of deference that courts accord to an All-County Letter depends on the substance of the All-County Letter as a quasi-legislative rule or merely an interpretation of the statute." (*In re H.C.* (2017) 17 Cal.App.5th 1261, 1268-1269 (*H.C.*).) "Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. To quote the statement of the Law Revision Commission in a recent report, 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.'" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 8 (*Yamaha Corp.*); but see *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 436 [when agency has special expertise and its decision is carefully considered by senior officials, decision entitled to greater weight].)

We view All-County Letter 10-47 as interpretive. (*H.C., supra,* 17 Cal.App.5th at pp. 1268-1269.) The timeline outlined in the All-County Letter is thus not binding. The All-County Letter was drafted in 2010 to provide direction for statewide implementation

---

[13]  While the statutory language suggests that a tribe does not identify tribal customary adoption as the permanent plan until the section 366.26 hearing, necessitating a continuance for the completion of the tribal customary adoption order (see § 366.24, subd. (c)(6)), we recognize that the process can be condensed, as it was here, as long as parents are afforded a meaningful opportunity to present evidence to the tribe regarding tribal customary adoption and the child's best interests before the tribe finalizes the order.

17

of tribal customary adoption until such time as regulations are adopted. (All-County Letter, p. 2, fn. 1.) It was not the product of any formal agency decision making in accordance with the Administrative Procedures Act, and no formal regulations have been forthcoming. To the extent that the All-County Letter is consistent with the statutes, its guidance is helpful; however, to the extent that it diminishes parents' due process rights, we decline to grant it deference. (See *Yamaha Corp., supra,* 19 Cal.4th at p. 7.)

4. *The parents' due process rights*

The parents contend that they were denied due process because they did not have an opportunity to present evidence to the Tribe regarding the children's best interests. The court did not continue the section 366.26 hearing in this case.[14] Instead, at the contested hearing, the court selected tribal customary adoption as the permanent plan after the parents each presented evidence opposing it. While the Tribe had a representative in attendance at the hearing at which the parents' evidence was presented, because the Tribe completed the tribal adoption order and submitted it in advance of the hearing, the hearing did not afford the parents a meaningful opportunity to present evidence to the Tribe regarding the terms of the proposed tribal customary adoption or the children's best interests *before* the Tribe prepared its tribal customary adoption order.

---

14  On the date originally set for the section 366.26 hearing, the Tribe recommended a tribal customary adoption, and the court set a trial date and prehearing conference. However, the court did not consider any permanency plan for the children on that date, instead addressing the matter for the first time at the contested section 366.26 hearing the following month. That hearing was not continued.

18

However, the court also contemplated whether due process had been provided to the parents through communications between the parents and the Tribe that occurred prior to the hearing. There was contradictory evidence on this point. Mother and Father each testified that they had attempted to communicate directly with the Tribe, without success. Mother acknowledged that she might have spoken with the tribal social worker in October 2017, but also said that the conversation with the social worker concerned Aa.S., not A.S. or E.S. The Tribe's representative initially said that she had nothing to add pertaining to the section 366.26 hearing. Later, after the attorneys had presented their arguments, the Tribe's representative reported that she had had several conversations with Father since the time the Tribe first became involved in the case in 2017. The Agency also reported that it had been informed by the tribal social worker that she had spoken with Mother about the Tribe's recommendation prior to the section 366.26 hearing. Mother's attorney argued that there was more information that Mother wanted the Tribe to have before it recommended tribal customary adoption, including what insight she had gained, what services she had recently engaged in, and how visitation was going.

We consider evidence in the light most favorable to the juvenile court's action (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*)), and we do not second-

guess the court's assessment of the credibility of evidence.[15] (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589 (*Michael G.*) [appellate courts do not reweigh evidence or evaluate credibility of witnesses].)

The court found that the social worker had consulted with the Tribe, the Tribe had elected a permanency plan of tribal customary adoption, and the Tribe had supplied a tribal customary adoption order.[16] However, the court made no express finding as to whether the parents had been provided a meaningful opportunity to present information to the Tribe regarding tribal customary adoption or the children's best interests prior to the Tribe's preparation of the tribal customary adoption order.

While we would have preferred that the court make a specific finding on the record regarding subdivision (c)(7) of section 366.24, the record reflects that the parents communicated with the Tribe regarding the children's best interests before the tribal customary adoption order was final; Mother spoke with a social worker about the Tribe's adoption recommendation and Father had numerous conversations with the Tribe. The Tribal representative also said the parents had been provided many opportunities to work

---

[15] The Tribal Customary Adoption Order is dated November 12, 2017, and the tribal representatives testified that their communications with Mother occurred on October 17, 2017 and with Father several times since January 2017. This indicates that the parents provided information to the Tribe before the Tribe finalized the tribal customary adoption order.

[16] This finding is consistent with the requirement outlined in All-County Letter section 2.5, which requires the agency to consult with the tribe to complete its written assessment after reunification services have been terminated. However, this does not supplant the parents' right to offer evidence to the tribe, as required by section 366.24, subdivision (c)(7).

with the Tribe, including visits, phone calls, and consultations with the Indian specialist. The out-of-court communications with Tribal representatives after reunification services were terminated met due process requirements because the parents each had an opportunity to express their concerns regarding their children's best interests and the proposed tribal customary adoption to the Tribe.  Based on the evidence, the court could have reasonably concluded that the parents were afforded a sufficient opportunity to be heard by the Tribe before it finalized the tribal customary adoption order.  Accordingly, we conclude that the juvenile court did not abuse its discretion in awarding the tribal customary adoption order full faith and credit.

5. *Harmless error*

Even if we were to assume that the court erred by selecting tribal customary adoption without expressly confirming that the parents were afforded a meaningful opportunity to present their views to the Tribe regarding the tribal customary adoption and the children's best interests, any error was harmless beyond a reasonable doubt. (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 734 ["The standard of review where the parent is deprived of a due process right is whether the error was harmless beyond a reasonable doubt"].)

The parents do not indicate what additional information they would have shared with the Tribe that was relevant to the minor's best interests or the tribal customary adoption and that would have impacted the court's decision to grant the tribal customary adoption order full faith and credit.  Mother told the court that she wanted to present evidence to the Tribe about her own progress and her opposition to adoption because she

21

wanted to raise the children herself, but has not specified what that evidence would be. Father similarly cannot show prejudice under this standard because he offers no additional information about what he would have shared with the Tribe to attempt to persuade it to change its recommendation of tribal customary adoption or the terms of the tribal customary adoption order itself.

6. *Introduction of additional evidence at hearing*

Father also separately contends that his due process rights were violated because he was denied the opportunity to introduce evidence and cross-examine witnesses at the 366.26 hearing. He relies on *In re Dolly D.* (1995) 41 Cal.App.4th 440 (*Dolly D.*) and *Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751 (*Ingrid E.*) for this proposition, but these cases, even taken together, are not helpful.

In *Dolly D.*, the court concluded that it was a violation of due process rights and California Rules of Court, rule 1449(b) and 1450 to deny a parent the opportunity to cross-examine the social worker who prepared the jurisdictional report. (*In re Dolly D.*, *supra*, 41 Cal.App.4th at pp. 444-445.) In *Ingrid E.*, the court noted that due process in dependency proceedings is a flexible concept, the application of which depends on the circumstances and the balancing of various factors. (*Ingrid E.*, at p. 757.) There, the court denied the parent's request for a contested hearing to determine whether reunification services should be terminated. (*Id.* at pp. 754-755, 757.) It was not the scope of the hearing but the foreclosure of any opportunity to present a case at all that violated the parent's due process rights. (*Ibid.*)

22

The facts here are distinguishable because the parents' reunification services had been terminated at the previous, September 2017 hearing, placing them in a different procedural posture from that of the parents in these cases. Additionally, the parents here were not denied the opportunity to cross examine the witnesses who were responsible for drafting the reports admitted by the court, and the parents were given leeway in offering testimony regarding detriment and the best interests of the children.[17]

D. *Selection of Tribal Customary Adoption*

Mother and Father each contend that the court improperly limited the scope of the section 366.26 hearing to issues of adoptability and detriment. We disagree.

1. *Forfeiture*

As a general rule, failure to object at the hearing forfeits a claim of error on appeal. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 (*Dakota H.*); *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338-1339.) The parents not only failed to object to the proposed scope of the hearing; each expressly agreed to it. Mother's attorney stated that the law required a showing of detriment to oppose the recommended tribal customary adoption, and expressly acknowledged that Mother's testimony about her feelings and visitation "do[ ] not necessarily go to the crux of the [tribal customary adoption] issues." Father's attorney similarly stated on the record that minors' counsel's motion in limine provided the court with "an accurate reflection of the law." This acquiescence to the

---

[17] Father's briefing does not point to examples of the court prohibiting his attorney from cross-examining witnesses, and our review of the record does not reveal that this occurred.

23

scope of the section 366.26 hearing forfeits the parents' right to claim on appeal that the court improperly limited the scope of the hearing.  (Civil Code, §§ 3515, 3516; *Dakota H.,* at p. 221.)

2. *Scope of the Section 366.26 hearing*

Even if the parents had objected to the juvenile court's limiting the scope of the hearing to adoptability and detriment, the court did not abuse its discretion by granting the motion in limine to limit the hearing's focus.  The dependency court had previously terminated the parents' reunification services.  The purpose of the section 366.26 hearing was to determine a permanent plan that was in the minors' best interests.  (§ 366.26, subd. (b); *In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  When "reunification services have been terminated because the parents have failed to reunify, the emphasis is no longer on the parents' care, custody and control of the child, but on the child's needs for permanency and stability."  (*Sadie S., supra,* 241 Cal.App.4th at p. 1303.)  Thus, "[a]t a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child–adoption, guardianship or long-term foster care."  (*Michael G., supra,* 203 Cal.App.4th at p. 588.)  At this stage of the dependency proceedings, adoption is preferred because it ensures permanency and stability for the minors.  (§ 366.26, subd. (b)(1); *H.R., supra*, 208 Cal.App.4th at p. 763; *Celine R., supra*, 31 Cal.4th at p. 53.)  For Indian children, tribal customary adoption is preferred.  (*H.R.,* at pp. 763-764, 767; see Cal. Rules of Court, rule 5.725(d)(1).)

In a selection and implementation hearing, the court presumes that terminating parental rights is in the child's best interests, and the party opposing that result must

24

demonstrate a "compelling reason for determining that termination would be detrimental to the child" due to one of six enumerated reasons.[18] (See *In re C.A.* (2018) 24 Cal.App.5th 511, 521 [parents must establish exception to termination of parental rights]; see also *In re. A.A.* (2008) 167 Cal.App.4th 1292, 1321 [opponent to terminating parental rights via selection of traditional adoption plan bears the burden of proof]; § 366.26, subd. (c)(1)(B)(i)-(vi).) "[W]hile the statutory construction of section 366.26 places the burden on the party opposing traditional adoption to show that this form of adoption would be detrimental to the minor [citation], the interference with the minor's tribal ties that the Legislature has recognized and sought to avoid provides the prima facie showing of detriment that tips the preference in favor of tribal customary adoption." (*H.R., supra,* 208 Cal.App.4th at pp. 763-764; see § 366.26, subd. (c)(1)(B)(vi)(I).) Thus, for a parent to challenge a tribal customary adoption, the parent must demonstrate a "countervailing detriment." (*H.R.,* at p. 764.) Like the "detriment" defined by the exceptions in section 366.26, a "countervailing detriment" to a tribal customary adoption exists when there is a compelling reason that the selection of a tribal customary adoption would be detrimental to the child. (See, e.g., § 366.26, subd. (c)(1)(B).)

---

18    The six exceptions to terminating parental rights are (i) interference with the beneficial parent-child relationship; (ii) the child is at least 12 and objects to termination of parental rights; (iii) the child is in a residential facility, adoption is not likely, and continuing parental rights will not prevent a permanent placement upon the child's release from the facility; (iv) the child is living with a foster parent or Indian custodian who is unable or unwilling to adopt the child because of exceptional circumstances; (v) interference with the sibling relationship; or (vi) the child is an Indian child, and terminating parental rights would not be in the child's best interests. (§ 366.26, subd. (c)(1)(B)(i)-(vi).)

### 3. *Countervailing detriment*

The parents' arguments on appeal focus on what evidence the court should have admitted and considered in selecting a permanent plan in the best interests of the children. They contend that the court improperly limited the evidence that they wanted to submit at the 366.26 hearing. We disagree.

A trial court has broad discretion in ruling on the admissibility of evidence, and we will upset the ruling only if there is a clear showing of abuse of discretion. (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 121 (*Jordan R.*).) An abuse of discretion occurs when the court fails to apply the applicable legal standard. (*Harris, supra*, 60 Cal.App.4th at p. 736; *Shannon M., supra*, 221 Cal.App.4th at p. 289.)

The disruption of beneficial ties of the minor, including ties between the parent and child, is one type of countervailing detriment that might be caused by selection of tribal customary adoption as the minor's permanent plan. (*H.R., supra*, 208 Cal.App.4th at p. 768.). In keeping with the standards defined by section 366.26, the burden of proving countervailing detriment is a heavy one. (See, e.g., *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 [Legislature's preference overcome only in extraordinary situations].)

"A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "Evidence that a parent has maintained ' "frequent and loving contact" is not sufficient to establish the existence of a beneficial

26

parental relationship.' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643, quoting *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.)  Instead, to rise to the level that would warrant the selection of a permanent plan other than adoption, a parent must show "a substantial emotional attachment that would cause the children to suffer great harm if severed."  (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 648.)

Even if parents demonstrate a substantial emotional attachment, "[t]he benefit to the child from continuing such a relationship must also be such that the relationship ' "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." ' " (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449-450.)

At the selection and implementation hearing, the focus is on the form of adoption rather than the specific terms of a tribal customary adoption order.[19] (§§ 366.24, subd. (c)(6); 366.26, subd. (b)(2); *see H.R., supra*, 208 Cal.App.4th at p. 761.)  Because there is no requirement that a tribe submit the tribal customary adoption order prior to the court's selection of tribal customary adoption as the permanent plan, a party may have limited information about the potential loss of beneficial ties that will result from the tribal customary adoption.  Here, however, the court had before it the tribal customary adoption order, which granted the tribal customary adoptive parents discretion regarding visitation with the biological parents.  The court also heard testimony from Father that the parents had been permitted no visitation with their older daughter, Aa.S., who had been

_____

[19]    The tribal customary adoption order is not necessarily available to the court at the time it selects a permanent plan.  We discuss this further *post*.

27

adopted in a tribal customary adoption by the same tribal customary adoptive parents under an order with an identical visitation provision. This placed the court in a position to consider the parents' claims regarding the potential impact of the proposed tribal customary adoption on their relationship with A.S. and E.S.

Though the trial court erred in stating that testimony about visitation and Mother's impression of her bond with the children was not relevant to the scope of the hearing, because such evidence clearly can go to the issue of detriment, the court nonetheless permitted both parents to testify about the quality of their visitation with their children, and admitted documentary evidence regarding visitation that was included in the Agency's reports. In addition, the court gave the parents the opportunity to express their views. Mother testified that she had been visiting with the children weekly, that she loved the children, and that she wanted to be in their lives as much as possible. She told the court that it was in the children's best interests to see her more frequently and that she wanted to raise the children herself. Father testified that recently planned visitations with the children had not occurred as scheduled due to issues with the visitation center, and not because of Father.

The court received evidence that the parents had separately visited the children regularly and that the children had a good relationship with their parents and appeared to be comfortable at visits. However, the children also had no difficulty separating when the visits were over, had recently exhibited behavioral issues after visiting with Father, and the Agency opined that they had a special need for permanency. Thus, the court

28

heard evidence regarding the relationship between parents and the children, as well as the benefits to the children of adoption.

While courts may consider the potential impact on the children of disrupting beneficial ties if a tribal customary adoption is selected, the parties proffered no evidence of such adverse consequences to the children from this form of adoption, such as a bonding study.  (See *In re C.F.* (2011) 193 Cal.App.4th 549, 557.)  Moreover, in traditional adoptions, where parental rights are terminated, "[e]vidence of frequent and loving contact is not enough to establish a beneficial parental relationship." (*In re Noah G*. (2016) 247 Cal.App.4th 1292, 1300.)  Similarly here, where the tribal customary adoption order gives the tribal customary adoptive parents discretion to determine visitation, evidence of positive parental contact, alone, is not sufficient to demonstrate a countervailing detriment. The parents provided no argument as to how the benefit from their relationships with the minors would outweigh the benefits of adoption.  (*Autumn H., supra, 2*7 Cal.App.4th at p. 575.)

The court also did not abuse its discretion by determining that testimony regarding visitation narratives, difficulties with visitation scheduling, or progress with services was not relevant to its inquiry regarding the children's best interests, given the earlier termination of reunification services.  (See *Sadie S., supra*, 241 Cal.App.4th at p. 1303 [focus at section 366.26 hearing is best interests of child].)  The court permitted the parents to offer evidence of countervailing detriment.  We cannot say that the court's evidentiary decision was an abuse of discretion.

4. *Harmless error*

Even if the court erred in excluding the evidence, any error was harmless because the admission of the evidence would not likely have resulted in a more favorable outcome for the parents. Father argues that he would have had a reasonable probability of prevailing if he had been able to present evidence that he had been prevented from visiting with Aa.S. and that his visitation with A.S. and E.S. had been beneficial.[20] Mother argues she was prejudiced by the court's limitations on her testimony. We disagree.

"To the extent an alleged error violates state evidentiary law, 'even where evidence is improperly excluded, the error is not reversible unless " 'it is reasonably probable a result more favorable to the appellant would have been reached absent the error.' " ' " (*Jordan R., supra*, 205 Cal.App.4th at p. 134.) The court had before it evidence regarding the general nature and quality of visitation between the parents and the children, including evidence about the children's attitudes toward visiting with their parents, their comfort level with the parents, and the parents' behavior during visitation. Father also testified that he had not had contact with his oldest daughter since a tribal customary adoption plan was selected for her. Father contends that for all intents and purposes, his relationship with his children will be effectively terminated because the

---

[20]     Though the court excluded extensive evidence of Father's relationship with Aa.S. since the time of the selection of tribal customary adoption as her permanent plan, the court did admit evidence that he had no contact or phone calls since that order.

tribal customary adoption order gives visitation determination rights to the caregivers, who have not permitted Father to visit with Aa.S. since her tribal customary adoption.

The court had this evidence before it at the time it made its determination that a tribal customary adoption that included placement with the current caregivers and older sibling was in the children's best interests. While Father contends that he could have offered additional evidence to demonstrate that a tribal customary adoption would be detrimental to the children, he provides no indication of what that evidence is or how he would be able to demonstrate a probability of a result more favorable to him if he had been permitted to offer additional evidence. While Mother was prevented from discussing the visitation narratives, she presented to the court general information about her visits and how much she loved her children. She also testified that she believed it was in the children's best interests to see her more frequently. Like Father, Mother does not identify additional evidence that she was prevented from presenting that would demonstrate a probability of a result more favorable to her.

The parents' due process rights were not violated, either in their ability to present evidence to the Tribe or in their presentation of evidence to the dependency court. Further, the court did not abuse its discretion by limiting the focus of the section 366.26 hearing to evidence addressing the adoptability of the children and whether the selection of a tribal customary adoption would be detrimental to them.

## DISPOSITION

The orders are affirmed.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

BENKE, J.

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | D073561 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>C.S. et al.,<br><br>    Defendants and Appellants. | (Super. Ct. No. EJ3633B/C)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed October 3, 2018, was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties