Filed 11/29/21  In re G.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.B., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.B.,<br><br>    Defendants and Appellants. | E077346<br><br>(Super.Ct.No. J275671)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven O'Neill, Interim County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

A.B. (mother) appeals from an order terminating parental rights to her now-three-year-old son G.B. (G. or child).  She contends that the juvenile court erred by declining to find that the "parental-benefit exception" applied.  (See § 366.26, subd. (c)(1)(B)(i).)[1]  On this record — which includes evidence that the child clung to the prospective adoptive mother at the beginning of visits, had to be cajoled to visit with the mother, and sometimes cried or refused to visit at all — this contention is untenable.

I

FACTUAL AND PROCEDURAL BACKGROUND

In April 2018, the mother gave birth to G.  A nurse at the hospital reported that the mother appeared to have mental health issues.

When a social worker interviewed the mother, she admitted that she had mental health issues, but she refused to say what her diagnosis was.  She had been prescribed Prozac but had stopped taking it because she was pregnant.  She admitted saying during labor, "I don't care about the baby" and "I wish I had an abortion," although she claimed she did not mean it.  At the beginning of the interview, the mother was "compliant and understanding"; after a break, however, she suddenly became "hostile and angry."

A hospital psychiatrist diagnosed the mother as having depression and anxiety. He or she reported that "the mother has very limited coping skills" and was "prone to

---

[1]  This and all further statutory citations are to the Welfare and Institutions Code, unless otherwise indicated.

2

being overwhelmed." The psychiatrist concluded that "the mother's ability to parent is in question . . . ."

At one point during the pregnancy, the mother had been homeless, but she met a barista at Starbucks who took her in. The barista, when interviewed, said that the mother was "very depressed." The barista and her mother "ha[d] provided [the mother] with everything she has."

The Department proposed a safety plan, but the mother refused to agree to it. The Department therefore detained the child and filed a dependency petition regarding him.

When the child was detained, he was placed in foster care with a Mr. and Ms. P. However, they asked that he be removed due to the mother's "'accusat[ory]' behavior." Thus, in July 2018 he was placed with a Ms. M.

Throughout the dependency, the father was listed as "[w]hereabouts [u]nknown." Fourteen months into the dependency, however, the mother disclosed that he lived next door to her. He did not respond to notices sent to that address.

In July 2018, at the jurisdictional/dispositional hearing, the juvenile court found that it had jurisdiction based on failure to protect (§ 300, subd. (b)) and, as to the father only, failure to support (§ 300, subd. (g)). It formally removed the child from the parents' custody and ordered reunification services.

The juvenile court ordered a psychological evaluation of the mother. She refused to cooperate with the designated psychologist, asserting her Fifth Amendment rights.

She was referred to a second psychologist, who managed to complete an evaluation. He diagnosed her as having bipolar (or a bipolar-related) disorder with histrionic and antisocial personality features. He reported that "[s]he experiences her son as placing many demands on her, she does not feel close to him, and her own unresolved personal issues may limit her maternal capability." He added, "It is likely that her rigid defensiveness . . . has resulted in an underestimate of her problems."

The mother filed grievances against both psychologists.

The mother successfully completed all of her reunification services. She was receiving Social Security disability benefits due to her mental health issues. However, she was living in a trailer without air conditioning, a working shower, or, at times, even a working toilet. She admitted that the trailer was "unsafe" for the child. She entered a transitional living program, but she was terminated because she was "rude," "belligerent," and "inappropriate." The Department offered her other assistance with housing, but she did not take advantage of it.

Her therapist characterized her as a "help-rejecting complainer." For example, when her therapist suggested that "getting a job might allow her to meet her goals better," she "retorted by calling the therapist a Republican."

The mother texted, emailed, and phoned CFS staff "excessively" and "compulsive[ly]." Once, for example, she sent nine lengthy emails (15 printed pages) in one 12-hour period.

4

She was "over[-]protective" of the child. She displayed "anxiety" and "paranoia" about him — for example, she worried that he was being abused during his speech therapy sessions or sexually molested by CFS staff.

Even after she was asked not to contact the foster mother and to route any concerns through the social worker, her "communication" with the foster mother continued to be both "overwhelming" and accusatory.

In November 2020, Ms. M asked that the child be removed. He was placed with a Mr. and Ms. R.

In January 2021, at the 24-month review hearing, the juvenile court terminated reunification services and set a section 366.26 hearing.

In June 2021, at the section 366.26 hearing, the mother's counsel asked the juvenile court to find that the parental-benefit exception applied.

The juvenile court found "that Mom has not acted in a parental role in a very long time in G[.]'s short life; that while she is a consistent visitor with him, I do not believe that the termination of parental rights would be so detrimental to him that it would outweigh the benefits of adoption."

The juvenile court further found that the child was adoptable. It therefore terminated parental rights.

## II

## THE APPLICATION OF THE PARENTAL-BENEFIT EXCEPTION

A.     *Additional Factual Background.*

The evidence at the section 366.26 hearing consisted of one social worker's report, one "Additional Information to the Court" report (a/k/a CFS 6.7 form), and the mother's oral testimony. We confine our consideration to this evidence (see § 366.26, subd. (b); Cal. Rules of Court, rule 5.725(d)), which showed the following.

As of the date of the section 366.26 hearing, the child was three. The mother had supervised visitation twice a week. She visited regularly; she had never missed a visit. He understood that he had two mommies.

According to the mother, the child called her "Mama." In her opinion, the child was bonded to her.

It was reported, however, that the child "has little interest" in visitation. "At the beginning of most visits, the child has to be convinced to go with his mother." "[T]he child appears anxious and is almost in tears while holding onto the caregiver[']s hand, leg, or neck . . . ." "The mother makes immense efforts for G[.] to go with her, such as offering to take him to the store to buy him a toy." Nevertheless, "it takes the child a minimum of 15-30 minutes to go with his mother, and some days he leaves crying or refuses to attend the visit."

One visit had to be canceled because he "refused to let go of the caregiver[']s arms." On another visit, he said he did not want to visit the mother (whom he called by her first name), adding, "I want to go home."

During one video visit in February 2020, the mother asked that the then-foster mother leave the room. She was told that the child could not be left unattended. The mother proceeded to have a "meltdown," "crying hysterically" and "making disrespectful and inappropriate comments toward the caregiver" in front of the child.

According to the social worker, the child "appears to be appropriately attached to his prospective adoptive parents, . . . and the attachment appears to be mutual." He was "very comfortable in his home environment and in the care of Mr. and Mrs. R. to whom he refers as his parents."

B.      *Legal Background.*

"'[A]t a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child — adoption, guardianship or long-term foster care.' [Citation.] At this stage of the dependency proceedings, adoption is preferred because it ensures permanency and stability for the minors. [Citations.]" (*In re A.S.* (2018) 28 Cal.App.5th 131, 152.) Thus, as a general rule, at a section 366.26 hearing, if the trial court finds that the child is adoptable, it must select adoption as the permanent plan and terminate parental rights. (§ 366.26, subds. (b)(1) & (c)(1).)

However, there are several exceptions to this rule. (§ 366.26, subds. (c)(1)(A)-(B), (c)(2).) One such exception applies if "[t]he court finds a compelling reason for

determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

The leading California Supreme Court case regarding this "parental-benefit exception" is *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). It was decided on May 27, 2021; the section 366.26 hearing here was held on June 23, 2021. There is no reason to suppose the juvenile court was unaware of *Caden C.* (See *In re Julian R.* (2009) 47 Cal.4th 487, 499 ["'"a trial court is presumed to have been aware of and followed the applicable law."'"]

Under *Caden C.*, to establish the parental-benefit exception, a parent must prove three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The parent has the burden of proving these elements. (*Id*. at pp. 636-637.)

In "assess[ing] whether 'the child would benefit from continuing the relationship,' . . . the focus is the child. . . . [T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs

the benefit to the child of placement in a new adoptive home. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The court must ask, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.]" (*Id*. at p. 633.)

"[A] substantial evidence standard of review applies to the first two elements." (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) But "the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*Id*. at p. 640.) "A court abuses its discretion only when ""'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""' [Citation.]" (*Id*. at p. 641.)

C.    *Application to These Facts*.

The mother's contention borders on the frivolous, in light of the evidence that the child was distressed by visitation and tried to stay with the prospective adoptive mother rather than go to the mother. In addition, at one visit, the mother had a "meltdown" when the prospective adoptive mother refused to leave the child alone in a room in front of a video screen. The child had virtually never been in the mother's custody. He had spent his early, bonding years with foster parents, most recently the R.'s. It was reported that he was attached to the R.'s. Finally, there was no evidence that termination of parental

9

rights would be detrimental.  It did not appear that the child missed the mother or suffered when apart from her.

The mother opined that the child was bonded with her, but the juvenile court was not required to accept her opinion, particularly as she did not state any facts supporting it.  "An opinion is only as good as the facts and reasons on which it is based.  [Citations.]" (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 763.)

At one point, the mother requested a bonding study.  The trial court granted the request and authorized funding for the study.  Nevertheless, for whatever reason, no bonding study was ever filed.  In the absence of a favorable bonding study, it is an uphill battle to prove the necessary beneficial relationship.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4; *In re J.C.* (2014) 226 Cal.App.4th 503, 533-534 ["There was no bonding study or evidence, other than Mother's self-serving declaration, to counter the social worker's conclusion J.C. would not suffer any detriment."].)

The mother claimed that the child called her "Mama."  However, in his only quoted reference to her, he called her by her first name.  In any event, this fact, even if true, would not be controlling.  The child understood that he had two mothers; however, the evidence showed that he was attached to the prospective adoptive mother, not to the mother.

The mother argues, "G[.] was only three years old at the time of the section 366.26 hearing and already had three placements.  [Citation.]  It was not unreasonable for him to display attachment issues and difficulty transitioning to mother during visits given his

10

placement history." This turns the applicable standard of review on its head — it asks us to draw an inference in favor of reversal, not affirmance. It is equally inferable (if not more so) that the child simply did not have a beneficial relationship with the mother.

The mother relies extensively on social worker's reports filed in connection with earlier hearings. As already stated, we cannot consider this evidence. If only out of an excess of caution, however, we note that even if we did, it would not change the outcome. No matter how idyllic earlier visits may have been, they had clearly become distressing to the child.

At one point, the juvenile court commented, "I don't believe [the mother] would ever do anything intentionally to harm G[.] [¶] But as I indicated when I terminated services, she simply can't parent the child, at least not on a full-time basis, and did not even really engage in unsupervised visits when those were offered . . . ."

The mother seizes on this comment and argues that it shows that the trial court applied an incorrect legal standard. As she correctly points out, "[a]t the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) "[W]hether the parent is or is not 'ready for the children's return to her custody' is not, by itself, relevant to the application of the parental-benefit exception. [Citation.]" (*Id.* at p. 638.)[2] However, it

_____

[2]     The mother concedes that "[f]or the beneficial relationship exception to apply, the emotional attachment between mother and her children must be of a parental nature. [Citation.]" Thus, she does not take issue with the juvenile court's further comment that "Mom has not acted in a parental role in . . . G[.]'s short life . . . ."

11

appears that the juvenile court was merely recapitulating the history of the case. It never said that it was basing its decision on the mother's inability to resume full custody.

Even assuming, for the sake of argument, that the juvenile court erred in this respect, the error was plainly harmless. Given the child's distress during visitation, it is not reasonably probable that the juvenile court would have found, under the correct legal standard, that the parental-benefit exception applied. (See Cal. Const., art. VI, § 13.)

In sum, on this record, it was not "arbitrary, capricious, or patently absurd" to rule that the parental-benefit exception did not apply.

III

DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

FIELDS
J.

RAPHAEL
J.

12