Filed 11/8/22  In re B.J.L. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re B.J.L., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>L.L.,<br><br>　　Defendant and Appellant. | A164095<br><br>(Contra Costa County Super. Ct. No. J19-00880) |

　　L.L. (Mother) appeals after the juvenile court terminated her parental rights to her daughter, B.J.L. (Minor). She contends the juvenile court did not use the correct standard in considering whether to apply the beneficial parent-child relationship exception to the preference for adoption. She also contends that inquiry into her heritage under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) and related California law (Welf. & Inst. Code, § 224 et seq.)[1] was inadequate. We agree with Mother that the

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

ICWA inquiry was inadequate, and we conditionally reverse the order terminating parental rights and remand the matter to the juvenile court to conduct further inquiry. We reject Mother's other contentions.

### FACTUAL AND PROCEDURAL BACKGROUND

## I. Detention and Jurisdiction

Minor was six years old when this dependency began in September 2019. According to her maternal aunt (Aunt), Minor was born addicted to methamphetamine, leading to intervention by the Contra Costa County Department of Children and Family Services (the Department), and she was placed with Aunt and her family for the first two years of her life. Mother had not had a permanent residence for the four years leading up to the current dependency. During that time, she lived in a tow yard, on the streets, and sometimes with Aunt.

Mother moved out of Aunt's home in approximately July 2019, but Aunt continued to provide care for Minor daily, including taking her to school and picking her up. Mother and her boyfriend, Carlos, would appear at Aunt's home at random times to pick up Minor, sometimes as late as 10:00 p.m. On the evening of September 17, 2019, Carlos dropped Minor off with Aunt, saying Mother could not handle her. The next day, Mother appeared at Aunt's home and demanded that Minor be returned to her care. In light of her irate behavior and history of substance abuse, Aunt's adult son suspected she was under the influence and was not comfortable allowing Minor to go home with her.

Law enforcement officers were summoned, and Minor told them she would like to stay with Aunt. Officers conducted a welfare check of Mother's home, and saw a box cutter with the razor blade exposed, several dirty ashtrays full of cigarettes and ashes in the living room, a methamphetamine

2

pipe on the coffee table in the living room, and a razor knife with the blade exposed on the couch. A large butcher knife was stuck into the tree in front of the house. Mother was arrested for child endangerment and neglect.

A social worker visited Mother's home a few days later and saw ashtrays and a bottle of Suboxone within a child's reach. The bathtub was clogged and had standing water, and there was mold on the shower tile.

Mother said that she last used methamphetamine four years ago and that she drank one wine cooler after work. The work program where Mother and Carlos were employed reported that they both appeared to be under the influence of narcotics and/or alcohol while at work.

The social worker met with Minor. Minor said that her home was at Aunt's residence. The social worker had Minor do a "three houses" exercise. For the "good house," Minor drew Mother, Aunt, Carlos, and " 'her sister.' " In the "house of dreams," she drew a bed where she could sleep at Mother's house. Her "house of worries" consisted of ghosts.

Minor had developmental delays. When the dependency began, six-year-old Minor was not toilet trained. She had sensory integration disorder and speech delay.

On March 3, 2020, the juvenile court adjudged Minor a dependent child and ordered her placed in foster care, with reunification services for Mother. Minor was placed in Aunt's home.

## II.    Review Hearings

Mother visited Minor consistently, she behaved appropriately, and Minor enjoyed the visits. Mother called Minor every evening to say goodnight. She completed an outpatient substance abuse treatment program, but one of her drug tests was positive for marijuana and on another occasion there was reason to think she submitted a sample of someone else's urine. At

the six-month review hearing on August 25, 2020, the juvenile court continued Minor in her out-of-home placement, with reunification services for Mother.

Mother was living with Carlos. Minor's therapist reported Minor felt unsafe with Mother because of Mother's relationship with Carlos. She said she felt safe only with her relative caregivers. She said she loved Mother but did not feel Mother was able to keep her safe. She recalled Mother leaving her home alone at night; she would bury herself under the covers and feel "so afraid."

Mother continued to visit Minor consistently, on a weekly basis, Minor enjoyed the visits, and the visits went well. Unsupervised visits began on October 5, 2020, but they had to take place in the community because Mother was living with Carlos, who had an extensive substance abuse and criminal history. Twice that month, however, Mother took Minor to the home, and Carlos was present. As a result, the social worker told Mother visits would have to take place at the Department. At the 12-month review hearing on January 19, 2021, the trial court continued Minor's placement and Mother's reunification services.

## III. Termination of Reunification Services

A contested 18-month review hearing took place on May 4 and 7, 2021. The evidence showed Mother's consistent visits with Minor continued, two hours a week, the visits still taking place at the Department, and Mother continued to behave appropriately. Minor looked forward to the visits and enjoyed them. The social worker testified that Mother and Minor loved each other. However, Minor had said repeatedly that she would not feel safe living with Mother and Carlos, that she was scared of Carlos, and that she wanted to live with Aunt. She had nightmares about being left alone at night.

During a visit in February 2021, the social worker smelled what seemed to be alcohol on Mother's breath. However, Mother behaved appropriately during the visit.

Mother had not been attending therapy. The therapists she had seen said she was resistant to treatment and was "in denial" about the reasons for the dependency. She had not completed a substance abuse program.

The juvenile court terminated reunification services and set a hearing pursuant to section 366.26 to adopt a permanent plan for Minor.

## IV. Termination of Parental Rights

The section 366.26 hearing took place on October 26, 2021.

### A. The Department's Evidence

The Department introduced evidence that Mother continued to visit with Minor consistently. Until early May 2021, the visits took place at the Department's office and were supervised. Mother often brought snacks, and on a few occasions provided sandwiches, fruit, or cheese and crackers. They engaged in imaginative play, board games, and picnics by a pond, and Mother read books to Minor. Mother helped Minor with her homework during one visit.

Visits moved to Aunt's house in early May 2021. Mother played with Minor during the visits, and did not cook dinner, make snacks, or bathe Minor. During visits, Minor was affectionate with Mother and hugged her. The social worker testified that visits were scheduled to take place for an hour on Sundays, although Mother and Aunt could make other arrangements and the visits sometimes lasted a few hours. Minor enjoyed the visits, and she said she had fun and liked to play with Mother. According to the social worker, Minor did not ask to spend time with Mother away from Aunt's home, she showed no distress when visits were ending, and she did not ask to

have the visits last longer. When Minor needed something, she looked to Aunt to provide it.

After visits, Minor sought extra hugs from Aunt and reassurance that Aunt would not leave. Aunt and her husband (Uncle) wished to adopt Minor, who had lived with them more than half her life.

Minor consistently told the social worker she did not want to return to Mother's home. The social worker told Minor that being adopted would mean that she would stay in Aunt and Uncle's home until she was an adult, and Minor threw her hands up in the air and said, "Yay," as if excited about the prospect. The social worker said there was "definitely a lot of love" in Aunt and Uncle's home. Minor was very comfortable with them, and she liked to sit with them or on their laps. She turned to them if she needed anything, and she showed off pictures of her with Aunt, Uncle, and their son. She said that if she was feeling sad or upset, she talked to Aunt and her therapist.

### B. Mother's Testimony

Mother testified that she called Minor every evening to say prayers together and that she visited two or three times a week. During visits, they played with Barbie dolls and read. Mother brought toys, books, and snacks to visits. She also played hopscotch and jump rope to help Minor with her coordination disability. Minor made gifts and drew pictures for Mother. They hugged, and Minor lay on Mother during visits. At the end of visits, Minor would ask Mother to stay. Mother testified that she and Minor loved each other and shared a "bond that a mother and a child have."

Mother testified that when Minor was in kindergarten, she arranged to have Minor evaluated for learning issues. Since the dependency began, however, Mother could not participate in Minor's individualized education plan because she had to stay away from the school.

6

### C. The Court's Ruling

The juvenile court terminated parental rights, finding as it did so that Mother had maintained regular visitation and contact with Minor and that they shared a relationship and had affection for each other, but that the benefits of the relationship did not outweigh the benefits and stability of permanency.  Mother appeals from this order.

## DISCUSSION

## I.    Parental-Benefit Exception to Adoption

### A. Legal Background

The purpose of a section 366.26 hearing after reunification services have been terminated is to select a permanent plan in the dependent child's best interests.  (*In re A.S.* (2018) 28 Cal.App.5th 131, 152.)  At this point, the focus is no longer on the parent's interest in reunification but on the child's needs for permanence and stability.  (*Ibid.*, citing *In re Sadie S.* (2015) 241 Cal.App.4th 1289, 1303.)  Adoption is the preferred alternative.  (§ 366.26, subd. (b)(1).)  The juvenile court presumes that terminating parental rights is in the child's best interest, and a parent has the burden to demonstrate a " 'compelling reason for determining that termination would be detrimental to the child' due to one of six enumerated reasons."  (*A.S.*, at p. 152, citing § 366.26, subd. (c)(1)(B).)  Among those is that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

The juvenile court's rejection of this "parental-benefit exception" is before us now.  Our high court engaged in an extended analysis of this exception in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).  It explained that the parent has the burden to prove three elements:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would

7

*benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Id*. at p. 631.) In assessing whether termination would be detrimental, the trial court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id*. at pp. 631–632.)

The first element asks simply whether the parent visits consistently, to the extent permitted by the court. (*Caden C*., *supra*, 11 Cal.5th at p. 632.) This is a factual question, and we review the juvenile court's determination for substantial evidence. (*Id*. at pp. 639–640.)

For the second element, courts consider whether "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[T]he focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C*., *supra*, 11 Cal.5th at p. 632, quoting *In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.) Courts may also look to how the child feels about, interacts with, looks to, or talks about the parents. (*Caden C*., at p. 632.) And the court should bear in mind that parent-child relationships do not "conform to an entirely consistent pattern," and it is not necessary "to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Ibid*.) To satisfy this element, the parent "must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Id*.

8

at p. 636.) We review a juvenile court's finding on this element for substantial evidence. (*Id.* at pp. 639–640.)

The third element—whether termination of parental rights would be detrimental to the child due to the parent-child relationship (§ 366.26, subd. (c)(1)(B))—requires the court to decide "whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The question is not whether the parent can provide a home for the child, it is whether the harm of severing the parent-child relationship "outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. . . . When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.) We review the juvenile court's determination on this issue for abuse of discretion. (*Id.* at p. 640.)

**B. Analysis**

Mother contends that she met her burden to prove all three of these elements and that the juvenile court relied on improper factors in deciding

9

otherwise.  As to maintaining regular visitation and contact, there is no dispute that this element is met, as the trial court found.

As to the second element—whether Minor would benefit from continuing the relationship—Mother points to evidence that Minor looked forward to the visits and did not want her to leave; that Mother behaved appropriately during visits; that they loved each other and showed affection with words and gestures; that she brought toys and games to visits; that she engaged Minor in jumping rope and hopscotch to assist with her motor development; that she once helped Minor with her homework; that early in the dependency, Minor's "dream house" included only Minor and Mother; and that the adoption social worker who testified had never observed a visit between Minor and Mother.

In announcing the basis for its ruling, the juvenile court did not distinguish clearly its findings on the second and third elements of the parental-benefit exception.  The court found there was a "parental relationship in the sense that [Minor] knows that [Mother] is her mother, and I have no doubt that they have affection for each other."  But, the court went on, the relationship seemed superficial in that it was "primarily one of a fun person to play with when they get together."  Although Aunt allowed Mother to visit whenever she wished and to extend her visits for several hours, Mother did not engage in such parental activities as helping with homework, providing food, and eating together.  The court additionally credited the evidence that Minor had not asked to spend additional time with Mother, that Minor turned to Aunt rather than Mother for help, that after visits Minor asked Aunt for reassurance that she would not leave her, that Minor said she did not want to live with Mother and felt safe with Aunt, and that Minor jumped and yelled "Yay" when told that she could have a permanent

home with aunt. Stressing the benefits of permanence, the court concluded that a permanent home with the Aunt who was her primary caregiver was in Minor's best interest. Without discounting the evidence on which Mother here relies, the court found the relationship between Mother and Minor was not sufficiently beneficial that Minor would suffer detriment from terminating it, particularly when balanced against the stability of permanency.

Mother argues that the trial court improperly discounted her relationship with Minor because it did not consider the relationship "parental." In support of her argument, she draws our attention to a number of cases that have considered whether, in light of *Caden C.*, it is appropriate for a court to require a parent to occupy a "parental role" before applying the parental-benefit exception. The Department inexplicably ignores these cases in its respondent's brief, but they demand our consideration.

*Caden C.* cautions that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," and that "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) And in weighing whether termination of parental rights would be detrimental, the court should not compare the parent's attributes as a custodial caregiver to those of a prospective adoptive parent. (*Id.* at p. 634.)

In cases preceding *Caden C.*, courts considering the parental-benefit exception looked to whether the parent "occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent" (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 954; accord, *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–1419), characterizing a "parental role"

11

as "more than frequent and loving contact, an emotional bond with the child, or pleasant visits" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229) or more than that of a " 'friendly visitor' " (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468).

After reviewing this background and the decision in *Caden C.*, the court in *In re L.A.-O.* (2021) 73 Cal.App.5th 197, concluded that the term "parental role," standing alone, was ambiguous and it "can be understood in ways that conflict with *Caden C.* and in ways that do not." (*Id.* at pp. 202, 209–211.) The appellate court suggested it was better not to use the term, focusing instead on whether there is a " 'substantial, positive emotional attachment between the parent and child.' " (*Id.* at p. 211.) The court then turned to the facts of the case before it; in declining to apply the parental-benefit exception, the juvenile court explained that the children had been removed from the parents for a significant time, most visits had been supervised, and the parents " 'ha[d] not acted in a parental role in a long time.' " (*Id.* at p. 205.) This "terse" ruling, the appellate court concluded, was susceptible to a proper interpretation—that "the children had a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents"—and to an improper one—that the parents were not capable of taking custody, had not been good parents, or had not been providing necessary parental care. (*Id.* at pp. 211–212.) Because it could not discern the basis of the juvenile court's ruling, the appellate court remanded the matter with directions to reconsider the application of the parental-benefit exception. (*Id.* at p. 212; see also *In re D.M.* (2021) 71 Cal.App.5th 261, 270 [remand where juvenile court said father did not attend medical needs and had not risen to level of parent, but said nothing about the attachment between father and children]; *In re J.D.* (2021) 70 Cal.App.5th 833, 864–865 [juvenile court's "conclusory"

12

statement that relationship did not " 'amount to a parental bond' " could have encompassed factors irrelevant under *Caden C.*]; *In re M.G.* (2022) 80 Cal.App.5th 836, 848 [psychologically or emotionally significant relationship may exist even if parents do not occupy parental role].)

As Mother recognizes, two recent decisions have declined to remand a case for a new hearing on the application of the parental-benefit exception, *In re Katherine J.* (2022) 75 Cal.App.5th 303, and *In re A.L.* (2022) 73 Cal.App.5th 1131. The juvenile court in *Katherine J.* concluded a father whose own violent actions had led to a restraining order and disrupted the visitation schedule with his daughter had " 'not occupied a significant parental role.' " (*Katherine J.*, at pp. 315–316.) While agreeing that "*Caden C.* requires juvenile courts to do more than summarily state that a parent has not occupied a parental role in his child's life," the appellate court concluded there was no error. (*Id.* at p. 319.) That was because the juvenile court did not rely on the bare conclusion that the father did not occupy a parental role but explained what it meant by that, that is, that his unresolved issues with substance abuse and violence had destabilized the child's life for years, compromising his ability to maintain a strong, positive emotional attachment with her. (*Id.* at pp. 319–320.)

Focusing on the third element of the parental-benefit exception, whether the detriment of severing the relationship outweighed the benefit of an adoptive home, the court in *In re A.L.* concluded it was appropriate for the juvenile court to consider "whether, and the extent to which, the caregivers and [parent] occupied parental roles with the minor," because "the strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding." (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1157.) In contrast

13

to the situation in *In re J.D.*, the juvenile court in *A.L.* found there was a beneficial relationship between the father and the child; while it may have been improper to rely on whether a parent's role was "parental" in that second-element inquiry, such a relationship was relevant to the balancing in the third element. (*In re A.L.*, at p. 1161.)

Likewise, a natural reading of the juvenile court's ruling here is that it found Mother satisfied the second element of the parental-benefit exception, although there were limits to the bond. Immediately after referring to *Caden C.,* the court found Mother had maintained regular visitation and that she had a relationship with Minor, but it was limited in depth and in the degree to which it was parental. The court then discussed a variety of factors, including that Mother spent her visits playing rather than helping with homework, guiding Minor, or preparing meals; that Minor did not ask for additional time with Mother; that she looked to Aunt rather than Mother for help, that she needed additional reassurance after visits that Aunt would not leave her; and she said she wanted to stay with Aunt. And, the court explained, Minor, now eight years old, had spent the first two years of her life and the most recent two years—all told, about half her life—in Aunt's care; she and Mother had lived with Aunt a significant portion of the intervening four years; and even when Mother and Minor were not living with Aunt, Aunt and Uncle often took Minor to and from school and had her for overnight visits. Aunt's home was thus the only stable home Minor had ever known, and she and Uncle had a long-term parental relationship with Minor. (See *Caden C., supra,* 11 Cal.5th at p. 632 [proper factors include the child's age, how much time has been spent in the parent's custody, effects of the interactions, the child's particular needs, and how the child feels about and looks to the parent]; *In re A.L., supra,* 73 Cal.App.5th at p. 1158 [weight

14

properly given to facts that prospective adoptive home was stable and that child was attached to caregivers and wanted to remain with them].)

Based on all of these factors, the court found that the relationship was "not sufficiently beneficial to" outweigh "the benefits and stability of permanency." It is thus apparent that the court considered the strength of Minor's attachment to Mother, and balanced the detriment of severing that relationship against the benefits that a permanent home would bring to Minor. And, contrary to Mother's contention otherwise, the court did not improperly impose a requirement that Minor's *primary* attachment be to Mother rather than the caregivers. (See *J.D.*, *supra*, 70 Cal.App.5th at p. 859 [parent need not prove child has *primary* attachment to parent].) While we agree that Mother's failure to help with homework or cooking would not suffice to defeat the parental-benefit exception, the court explained, at length, many reasons for its determination that were supported by the record and appropriate under the law. We see no error.

Relying on *In re J.D.*, Mother argues there is an additional ground for reversal, in that the social worker who recommended termination of parental rights—who had only recently been assigned to the case—did not ask Minor how she felt about Mother or about not seeing her again, and because the social worker had not observed any visits. While *In re J.D.* treats evidence of a child's feelings about a parent as useful, it also explains that it is the parent's burden to prove the existence of the parental-benefit exception. (*In re J.D.*, *supra*, 70 Cal.App.5th at pp. 860–861.) We do not read that case to require the social worker who recommends termination of parental rights to inquire into a child's feelings about adoption or personally observe a visitation, and, while we agree more information would have been better, we will not add such a requirement here.

15

## II. Inadequate ICWA Inquiry

Mother also contends the Department and the juvenile court did not satisfy their duty to inquire into her possible Native American ancestry. The Department acknowledges its inquiry fell short, but contends there was no prejudice.

The purpose of ICWA is to " 'protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian child from his or her family.' " (*In re S.H.* (2022) 82 Cal.App.5th 166, 173.) In service of this goal, when a child is placed in the custody of a county welfare department, the department must inquire whether the child is an Indian child. This inquiry includes asking the child, parents, and extended family members including aunts or uncles, whether the child is or may be an Indian child. (§ 224.2, subd. (b); *In re J.C.* (2022) 77 Cal.App.5th 70, 77; *In re A.C.* (2022) 75 Cal.App.5th 1009, 1015.) The inquiry need not be exhaustive, and the agency need not necessarily question every possible extended family member, but it must provide enough information for the juvenile court to make an informed determination of whether the inquiry was adequate and whether the child may be an Indian child. (*In re K.H.* (2022) 2022 Cal.App. Lexis 880, pp. *32–*33, *43, *60–*61.) In addition, the juvenile court, at the first appearance in court of each party, must ask whether the participant knows or has reason to know the child is an Indian child. (§ 224.2, subd. (c).)

At the outset of this dependency, Mother told a social worker she believed she had Native American ancestry but did not know the tribal affiliation. Shortly afterward, she signed an ICWA-020 form indicating she did not have any Indian ancestry. The form itself recited that it was "not intended to constitute a complete inquiry into Indian heritage" and that

16

ICWA might require further inquiry. The "Indian Child Welfare Act Status" discussion in the Department's disposition report and subsequent status review reports explained only that Mother had signed the form indicating she had no Native American heritage. It appears the juvenile court made no finding regarding ICWA until, on March 3, 2020, it found there was no reason to believe Minor was a Native American child.

The record does not show that the juvenile court asked Mother whether she had reason to know Minor was an Indian child. Nor does it show the Department asked Mother about the basis for her earlier statement that she might have Native American ancestry, or that the Department made any inquiry at all of either of Mother's two older sisters, one of whom was caring for Minor. The Department "acknowledges its shortcomings" in failing to make further inquiries of extended family members. We agree that this inquiry was inadequate. We must therefore consider whether it requires reversal.

Multiple recent appellate decisions have considered how to assess whether error in carrying out ICWA inquiry is prejudicial, and the issue is currently pending before our Supreme Court. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, rev. granted Sept. 21, 2022, S275578.) As recently explained in *In re K.H.*, *supra*, 2022 Cal.App. Lexis 880, pp. *45–*60, the courts have articulated several different tests for prejudice. At one end of the spectrum, some courts have required an appellant to show that, if asked, he or she would have claimed Indian ancestry. (See, e.g., *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069.) At the other end, some cases follow a " 'clear rule that requires reversal in all cases where the ICWA inquiry rules were not followed.' " (*In re G.H.* (2022) 84 Cal.App.5th 15, 32, quoting *In re E.V.* (2022) 80 Cal.App.5th 691, 694.)

There are competing approaches taking a middle ground. The court in *In re Dezi C.* held that "an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA." (*In re Dezi C., supra,* 79 Cal.App.5th at p. 779; accord, *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1014.) The court in *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744, took another middle-ground approach, holding that reversal is necessary where the record demonstrates not only that the agency failed in its duty of initial inquiry, but also that "there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child."

The court in *In re K.H.* looked at the issue through a somewhat different lens. It explained that the relevant rights under ICWA belong to Indian tribes, which have a statutory right to receive notice when an Indian child may be involved so they can determine whether the child is an Indian child, and "prejudice to those rights lies in the failure to gather and record the very information the juvenile court needs to ensure accuracy in determining whether further inquiry or notice is required." (*In re K.H., supra,* 2022 Cal.App. LEXIS 880 at pp. *8–*9.) The question for the reviewing court, under this analysis, is whether the juvenile court's discretionary determination of whether the agency conducted an adequate and diligent ICWA inquiry is supported by substantial evidence, or whether the agency's efforts "fall so short of the mark that the evidence is patently insufficient to support the court's determination, and [the court] abuses its discretion in finding the agency's inquiry was proper, adequate, and discharged with due diligence." (*Id.* at pp. *9–*10, *25–*28, *31.) Considering the appropriate standard for reversal, the court concluded that

18

"where the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*Id*. at p. *44.)

Whatever the relative merits of these varying approaches, we conclude the error here requires reversal. This is not a case of a record that is silent on the question of Indian heritage. Rather, Mother affirmatively told the social worker she believed she had Native American ancestry. Nevertheless, the record contains no indication the Department made any further inquiries, aside from having Mother fill out the ICWA-020 form. Not only could the Department have sought more information from *Mother* to resolve the contradiction, it also had ready access to at least one of Mother's two older sisters—who would have been a source of "readily obtainable information"— but there is no evidence it asked either of them about Indian ancestry. (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Bearing in mind the conflict in Mother's statements and the silence of the record on any attempt to follow up on her original statement with either Mother or her sisters, remand is necessary under any standard.

**DISPOSITION**

The order terminating parental rights is conditionally reversed. The matter is remanded with directions for the juvenile court and the Department to comply with the inquiry and (if appropriate) notice provisions of ICWA and state law. If, after compliance with the law, the juvenile court concludes ICWA does not apply, the order terminating parental rights shall immediately be reinstated. If, after proper inquiry and notice to applicable tribes, the court finds that Minor is an Indian child, the court must proceed in conformity with ICWA.

19

TUCHER, P.J.

WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.

*In re B.J.L.* (A164095)