Filed 2/20/25  P. v. Zamora CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MANUEL GUSTAVO ZAMORA,<br><br>Defendant and Appellant. | F086144<br><br>(Super. Ct. No. BF185617C)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

David W. Beaudreau, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Manuel Gustavo Zamora appeals following his conviction on one count of second degree murder (Pen. Code,[1] § 187, subd. (a)) and a related finding he personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)). Appellant and his half-brother, Fabian Villarreal, were jointly tried on first degree murder charges. Villarreal was eventually acquitted on all counts, while appellant was acquitted of first degree murder but convicted of the lesser included offense of second degree murder. In this appeal, appellant raises a variety of challenges to his conviction, including that the court wrongly denied his request to reopen jury selection, failed to provide a required instruction on a potential lesser included offense, and improperly excluded from evidence three different groupings of out-of-court statements. Appellant also notes an error in the calculation of his precustody credits. For the reasons set forth below, we affirm with instructions to modify appellant's precustody credits.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 7, 2021,[2] Edward Medina failed to answer calls and texts from his mother, causing her to become concerned. Medina's family and friends began searching for him and, on April 9, discovered his truck in a remote area of Kern County. Finding dried blood in the truck, Medina's family called the police.

Police inspected the vehicle and found it covered in dirt, scratches, and remnants from almond trees, despite there being no almond trees in the area where the truck was found. Although known by Medina's family to be his truck, the vehicle was registered to Ignacio Gonzalez. A few days later, on April 12, police responded to an almond orchard in Kern County, approximately nine miles from where the truck had been located, where a body had been reportedly found. There they located Medina, who had been killed by a

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Subsequent references to dates are to dates in the year 2021, unless otherwise stated.

single gunshot to the chest. Tire tracks found in the orchard were consistent with the tires on Medina's truck.

In a related incident, on April 7, a 911 call was made after two people witnessed an incident involving two men appearing to pull a body from a truck. At the time, these witnesses were driving away from a market (the Market). While passing a truck parked in the middle of the road, the witnesses saw two men standing in the dirt on the side of the road. According to one of the witnesses, the two men walked at a fairly quick pace to the truck, opened the door, pulled someone out of the truck, and kicked that person while they were on the ground. The witness heard a gunshot around the time the door was opened and saw that the man approaching the truck and opening the door had a gun. The witness then saw the two men drive away in the truck. Notably, the witness did not see the shooting victim with a gun.

The connection between the incident observed near the Market, the discovery of Medina's truck and body, and appellant came into focus when the police interviewed Gonzalez. Gonzalez, the registered owner of the truck, lived near the Market. Appellant's family owned and lived in a home two doors down from Gonzalez. As noted above, one member of appellant's family was appellant's half-brother, Villarreal.

Gonzalez testified that he had been in the process of selling his truck to Medina in 2021 for $2,000 and a trailer. The deal ran into some difficulties, however, when Gonzalez became concerned that the trailer Medina was giving him as part of the payment for the truck might be stolen. While sorting out the issue, Gonzalez allowed Medina to use and keep the truck.

At the same time, Gonzalez was also in some form of business dispute with a man named Jose Real. Gonzalez had bought a marijuana trimming machine from Real for $6,000 and had paid $3,000 up front. Gonzalez had agreed to pay the remaining sum after testing the machine. Real, however, had been upset about not being paid in full and had been appearing at Gonzalez's house weekly, armed and asking for his money. At the

3.

time, Real drove a black Scion. At some point, Gonzalez told appellant about Real's behavior.

On April 5, Gonzalez received a call from appellant, checking if Gonzalez was home. Gonzalez explained that the call arose because Medina and another person had come to Gonzalez's home to talk about the truck. In that conversation, Medina agreed to return the truck to Gonzalez, rather than go through with a planned inspection of the trailer by the California Highway Patrol, but stated he needed time to remove a stereo system.

Two days later, on April 7, Gonzalez was at home sleeping in preparation for work that evening. Video surveillance showed that both Real's and Medina's vehicles traveled away from appellant and Gonzalez's homes and toward the Market at approximately 6:56 p.m. At around 7:03 p.m., Villarreal is seen on the same surveillance video, initially walking toward the Market before turning around and heading back toward Gonzalez's home. Then, at 7:04 p.m., Medina's truck is seen traveling back toward Gonzalez's home from the direction of the Market. Approximately 20 seconds later, the vehicle driven by the two witnesses to the shooting is seen on the same video.

A review of appellant's phone records showed that he made two calls to Gonzalez's live-in girlfriend just before the time of the shooting and a call to Gonzalez at 7:08 p.m., just after the time of the shooting. Notably, Gonzalez affirmed that he had spoken with appellant, but denied that appellant told him at that time that the shooting was in self-defense. Rather, Gonzalez asserted appellant raised the self-defense claim in a conversation a couple of weeks later.

Further cell phone tower data suggested appellant was near the Market between 6:45 and 7:00 p.m. but moved progressively away from that area until around 7:25 p.m., when appellant was using a cell tower that covered the area where Medina's body was eventually located. At around 8:00 p.m., appellant was using a tower that covered the location where Medina's truck was eventually located.

4.

Testing of certain evidence collected in their investigation showed appellant could not be excluded from DNA samples discovered on the driver side door of the truck, the steering wheel, and the front passenger door. Other testing showed the presence of methamphetamine and alcohol in Medina's blood, which the defense elicited could cause aggressive behavior.

The jury was also played a portion of an interview appellant had with the police a bit more than a month after the shooting. In that interview, appellant claimed Gonzalez had sold the truck Medina was driving and denied ever being in the vehicle. Appellant claimed not to know Medina but to have seen him on the news. Appellant stated he didn't know of any disputes over the truck but had talked to Real about the marijuana trimming machine. He then denied seeing Medina on April 7 and denied having any knowledge of what happened to Medina, even after being confronted with the cell phone and DNA evidence. When asked directly if Medina had a gun, appellant responded, "I don't know."

Both Villarreal and appellant took the stand in their defense case. Villarreal testified that he ran into appellant at their family residence on April 7. At the time, appellant appeared to be stressed out and upset about something. At one point, Villarreal headed toward the Market, but was called back by appellant. At that time, Medina arrived in a blue pickup truck and parked in front of Gonzalez's house near where appellant was standing. Appellant began to argue with Medina before Villarreal claimed that Medina reached down for something and opened the truck door to get out. Villarreal could not see into the truck but heard a pop, causing him to freeze. Villarreal then saw appellant grab Medina's body as it fell out of the truck and saw a gun fall onto the ground.

Villarreal saw appellant get into the truck and turn it around before appellant asked Villarreal to help him. Villarreal helped load Medina's body into the truck and joined appellant as appellant began driving away. Villarreal claimed he thought the two were

going to the hospital, and when he realized appellant was not driving in that direction, Villarreal made appellant stop the truck and let Villarreal out.

Villarreal also testified to an event that occurred the day before the shooting. Villarreal said he saw Medina arrive at Gonzalez's house looking "a little bit" mad. Villarreal noticed Medina carrying a firearm that day and saw Medina arguing with Gonzalez. Villarreal claimed that Medina had arrived with a friend and that appellant was also present during the argument.

Appellant testified that he had been at his family's house in the days leading up to the shooting to take care of his aging grandfather. Appellant knew Gonzalez, Gonzalez's live-in girlfriend, and Real from numerous prior encounters but claimed not to know Medina despite admitting on cross-examination to having gone to Medina's house on April 6 to tell Medina that Gonzalez wanted to talk to Medina about the truck. On April 7, appellant saw two cars parked near Gonzalez's home. He decided to go outside to see why they were there and encountered Real and Medina.

Appellant testified that Real and Medina got out of the cars and were both acting aggressively, demanding to speak with Gonzalez. Appellant walked toward Gonzalez's home and said he would call Gonzalez. Real and Medina followed appellant and told him he needed to contact Gonzalez or they would go into Gonzalez's home. At this time, Medina raised his shirt, displaying a firearm.

Appellant claimed he became scared at this point, both for himself and for his child who lived in Gonzalez's house but was not present at the time. Appellant then pretended to place a call to Gonzalez before telling Real and Medina he could not reach Gonzalez. Real and Medina responded by telling appellant that Gonzalez had been "pressing up on them" and that appellant had better go get Gonzalez. Appellant then jumped the fence to Gonzalez's property as if to go to Gonzalez's front door. At this point, Real and Medina chose to leave, telling appellant they would come back later.

6.

Appellant returned to his house and collected a firearm from a place in the backyard that he had previously hidden it. Appellant then went back to the front of the property where he saw and called out to Villarreal. Appellant was telling Villarreal what had happened when Medina returned. Appellant thought Medina was back to do something to either appellant or Gonzalez.

Medina drove up to the front of Gonzalez's house, where appellant was standing, and parked. Medina nodded toward appellant in a manner that appellant understood as "what's up, foo," and appellant responded by telling Medina to "get the fuck out of here." Medina then opened the door to the truck, and appellant saw him reach for something black. Appellant responded by shooting Medina and claimed he felt he had to do so because Medina "was going to shoot [him]." Appellant claimed to see a gun fall to the ground where Medina was located.

Appellant testified he stood in shock for a period of time and then told Villarreal to help him. Appellant put Medina's body into the truck and both appellant and Villarreal drove away. At some point later, Villarreal told appellant to pull over to let Villarreal out of the truck. After doing this, appellant drove to the orchards and eventually abandoned the truck. Appellant further claimed he "got rid of" the gun Medina had because appellant was scared to be caught with it.

Based on the evidence presented, the jury found Villarreal not guilty of first degree murder or any lesser included offense. The jury also found appellant not guilty of first degree murder. However, the jury ultimately convicted appellant of the lesser included offense of second degree murder (§ 187, subd. (a)) and found true the allegation that appellant personally discharged a firearm that proximately caused Medina's death (§ 12022.53, subd. (d)). Based on these convictions and appellant's past criminal history, the trial court eventually sentenced appellant to a term of 30 years to life, plus 25 years for relevant enhancements. Appellant was granted 698 days of presentence custody credit.

7.

This appeal timely followed.

## DISCUSSION

Appellant's substantive contentions in this appeal raise issues with the jury selection process, the jury instruction process, and the exclusion of certain evidentiary statements on hearsay grounds. In addition, appellant raises a concern with the amount of presentence custody credits he received.

### *Jury Selection Claim*

Appellant contends the trial court abused its discretion when it declined to reopen jury selection after a juror belatedly raised concerns about serving. We do not agree the trial court's decision constituted an abuse of discretion.

*Relevant Facts*

The crux of the dispute regarding appellant's request to reopen jury selection is an individual eventually seated as Juror No. 2.[3] Juror No. 2 was initially added to the prospective jury panel after a series of initial challenges left the panel with less than 12 potential jurors. The refreshed panel of potential jurors were asked by the court if they could "think of any reason why you might not be able to try this case fairly and impartially or why you should not be on the jury" and did not raise any issues. During the subsequent voir dire, Juror No. 2 was asked to respond to questions or other juror's statements about telling the truth, observing a situation, carefully weighing evidence, when one can use deadly force, and other relevant matters. After this questioning, the panel was asked as part of voir dire if, having heard all the other answers, anything had arisen "where they think they couldn't or have concerns that they might not be a fair and impartial juror or even the best juror for this case." Again, Juror No. 2 raised no concerns.

---

[3] Juror No. 2 is confidentially referred to in the record as Juror No. 5979703 and was initially identified as Juror No. 22.

The prosecution and both defense counsel then began exercising challenges to the refreshed panel of prospective jurors. Through a series of peremptory challenges, potential jurors were excused until Juror No. 2 was seated on the panel. Juror No. 2 was the last juror added to the panel before both sides accepted the panel as constituted. At this point, neither side had exhausted all of their allotted peremptory challenges.

Immediately after both sides accepted the panel, the court asked the prospective jurors to stand and asked, "Is there absolutely any reason why you cannot serve?" Juror No. 2 responded affirmatively. In response, the court held a closed session where the court and counsel asked Juror No. 2 additional questions.

Juror No. 2 explained their concern as having "kind of like a professional obligation to be at work because one of my coworkers recently quit so I'm kind of needed there. So just like out of professionalism like I feel like I'm obligated to be there." Upon questioning, Juror No. 2 confirmed they were "willing to serve" and could still be fair. Further, although they had "a lot going on personally and professionally," it "would not impact my judgment." Juror No. 2 stated they were "a hundred precent" sure being kept as a juror wouldn't impact their view and explained their "life situation is making it a little stressful maybe." And Juror No. 2 confirmed they would not have to go into work at night to complete missed work. Ultimately, however, Juror No. 2 agreed it was "possible" that the stress from their situation might distract them during trial.

After this additional questioning, counsel for appellant sought to have Juror No. 2 excused based on the new information provided. The court denied this request, noting the information did not rise to a challenge for cause and that the work situation had not risen to the level of a hardship. Appellant's counsel objected to the panel as constituted, then asked if the court was "denying my ability to now kick [Juror No. 2] with a peremptory?" The court again asserted the information did not rise to the level of a cause challenge before noting appellant had made his record on the objection. The court then

9.

informed Juror No. 2 they would not be excused and eventually swore in the jury as constituted.

*Standard of Review and Applicable Law*

Under Code of Civil Procedure section 226, subdivision (a), a "challenge to an individual juror may only be made before the jury is sworn." "Subdivision (d) of [Code of Civil Procedure] section 231 then explains: 'Peremptory challenges shall be taken or passed by the sides alternately, commencing with the plaintiff or people; and each party shall be entitled to have the panel full before exercising any peremptory challenge. When each side passes consecutively, the jury shall then be sworn, unless the court, for good cause, shall otherwise order.' " (*People v. Cottle* (2006) 39 Cal.4th 246, 255, italics omitted.) "After the parties have passed on the jury but before the jury is sworn, the trial court may reopen jury selection and allow a peremptory challenge to be exercised if good cause is shown." (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 601 (*Beck and Cruz*).) However, "once both sides pass consecutively on peremptory challenges, even though the jury is not actually sworn, the right to exercise any remaining challenges is subject to the discretion of the trial court, based upon a showing of good cause to reopen jury selection." (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 504 (*DeFrance*).)

Good cause, "liberally construed, requires taking account of ' " 'real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith.' " ' " (*DeFrance, supra*, 167 Cal.App.4th at p. 504.) The trial court's decision whether or not to find good cause to reopen jury selection is reviewed for an abuse of discretion. (*Beck and Cruz, supra*, 8 Cal.5th at p. 604.)

*The Trial Court Did Not Abuse Its Discretion*

Relying on the guidance set forth in *Beck and Cruz* and *DeFrance*, appellant contends that good cause exists where "new information is revealed relevant to jury

10.

selection." Thus, according to appellant, where such information is revealed and the trial court refuses to reopen jury selection, an abuse of discretion exists. We do not agree.

It is correct that new information is relevant to the court's decision to reopen jury selection. In *Beck and Cruz*, after originally expressing no hesitation about applying the law with respect to implementation of the death penalty and being accepted as part of the jury, but before the jury was fully sworn in, the relevant juror revealed a view that would prevent application of the death penalty except in a highly specific instance. (*Beck and Cruz, supra*, 8 Cal.5th at pp. 602–603.) This change in position with respect to applying the law as written supported a trial court's good cause finding to reopen jury selection. (*Id.* at p. 604.) Similarly, in *DeFrance*, after both sides had passed on the jury as then constituted, the relevant juror revealed a concern that because he worked nights, he would have to stay up for 24 hours straight for several days in order to serve on the jury. (*DeFrance, supra*, 167 Cal.App.4th at p. 502.) The defense willingly agreed to dismiss the juror for this reason, but argued an alternate should be seated rather than allowing jury selection to be reopened. (*Id.* at pp. 502–503.) The changed circumstance of a dismissed juror supported a good cause finding because there "was a real, substantive and objective need to reopen jury selection." (*Id.* at p. 504.)

However, in neither case was the mere fact of new information sufficient to warrant good cause. In *Beck and Cruz*, the court affirmed a good cause finding based in part on the fact the juror's newly disclosed position resulted in that juror's belief that "he would be the cause for a hung jury." (*Beck and Cruz, supra*, 8 Cal.5th at p. 604.) In *DeFrance*, the good cause to reopen jury selection was the juror's inability to serve safely and the resulting dismissal by the defense, necessitating the replacement of that juror. (*DeFrance, supra*, 167 Cal.App.4th at p. 504.) In both cases, although new information had been disclosed, the trial court retained its discretion to determine whether that new information constituted good cause to reopen jury selection. As noted in *DeFrance*, the

good cause analysis considers the real circumstances of the case and the reasons offered for reopening jury selection.  (*Ibid.*)

In this case, Juror No. 2 was the last member of the jury seated and only added after several potential jurors were called and immediately dismissed.  Despite having several previous opportunities to raise concerns about service, Juror No. 2 then noted a potential concern about serving that was tied not to any specific need to work or conflict with service or his understanding of the law, but rather with an internal feeling of professionalism triggered by a coworker recently leaving their job.  The court and counsel inquired as to the import of this feeling and generally heard that Juror No. 2 felt they could serve without this feeling meaningfully impacting their role, even if it might be distracting.

In these circumstances, we find no abuse of discretion in the trial court's decision not to reopen jury selection.  The record does not compel a finding that the court had to determine the disclosures made satisfied the definition of good cause to reopen jury selection.  Rather, the "real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith" all indicated that Juror No. 2 had only a superficial concern with service that would not warrant reopening jury selection and the resulting efforts to again reach an agreed upon panel of jurors. (*DeFrance, supra*, 167 Cal.App.4th at p. 504, internal quotation marks omitted.)

We similarly reject appellant's contention that this analysis improperly conflates the basis for appellant's expected challenge to the juror with the basis for reopening jury selection.  It is true that these considerations will frequently overlap when the underlying issue is the disclosure of new information about the juror, but nothing in this court's analysis requires that the information disclosed be sufficient to warrant dismissing the juror for cause in order to support a good cause finding.  Rather, the decision in such a

12.

circumstance turns on whether the newly disclosed information demonstrates good cause to reopen under that term's liberal definition. This is an area where the court's discretion is paramount, as seemingly innocuous information could fall within a range of meaningless in the context of service to fully prohibitive of adequate service. The court's review and consideration of the information identified is thus not indicative of an improper understanding of the law, but rather constitutes an important step in determining whether good cause exists to exercise its discretion to reopen jury selection. As noted, in this case, the court was within its discretion to deny the request.

### *Jury Instruction Claim*

Appellant argues the trial court improperly failed to instruct the jury on the crime of voluntary manslaughter under a heat of passion theory. Appellant contends this failure violated his constitutional rights and warrants reversal. We do not agree.

*Relevant Facts*

Throughout the course of the trial, the court and the parties exchanged and edited a working document on the instructions requested and ultimately given. In the course of these exchanges, appellant requested the court give CALCRIM No. 570 for voluntary manslaughter under a heat of passion theory. The court rejected this request, ultimately only giving CALCRIM No. 571 for voluntary manslaughter based on imperfect self-defense.

*Standard of Review and Applicable Law*

Our Supreme Court has outlined the relevant principles when it comes to the obligation to instruct on lesser included offenses, including specifically the obligation to instruct on voluntary manslaughter under a heat of passion theory, in substantial detail. " '[E]ven absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. [Citation.] This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the

13.

offense was less than that charged.' " (*People v. Moye* (2009) 47 Cal.4th 537, 548 (*Moye*).) " 'Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation].' " (*Id.* at p. 549, italics omitted.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*Moye, supra*, 47 Cal.4th at p. 549.) The objective component requires " ' "the accused's heat of passion must be due to 'sufficient provocation' " ' " caused by or engaged in by the victim. (*Id.* at pp. 549–550.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at p. 550.) For the subjective component, "the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Ibid.*)

" '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty of the lesser offense is "substantial enough to merit consideration" by the jury.' " (*Moye, supra*, 47 Cal.4th at p. 553.) This requires the evidence be such that a jury composed of reasonable persons could conclude the lesser offense, but not the greater, was committed. (*Ibid.*)

We review the trial court's decision not to instruct on a lesser included offense de novo. (*People v. Simon* (2016) 1 Cal.5th 98, 133.)

*Substantial Evidence Does Not Support the Heat of Passion Instruction*

The determination whether a court must instruct on a potential lesser included offense is a heavily factual inquiry. This is particularly true with respect to a request for voluntary manslaughter on a heat of passion theory. Both the objective and subjective

14.

components of the analysis require consideration of the entirety of the evidence to determine whether or not the evidence suggesting such a defense is substantial enough that a rational jury could rely on it to find the defendant was provoked to the point that a reasonable person would forego reason and act out of passion.

In this case, facts potentially related to both the objective and subjective components come from the following narrative: On April 6, appellant potentially witnessed an argument between Medina and Gonzalez, in which Medina argued with Gonzalez about money. The next day, Medina and Real arrived at Gonzalez's home armed, upset, and intending to confront Gonzalez. Appellant saw Medina and Real's vehicles and, investigating their presence, spoke with both Medina and Real near Gonzalez's home. Medina and Real were aggressive, demanding to see Gonzalez and insisting appellant contact Gonzalez for them. In this confrontation, Medina lifted up his shirt, showing he was armed, and asserted he would go into Gonzalez's home if appellant did not help. Appellant first pretended to call Gonzalez and then headed toward Gonzalez's home, at which time Medina and Real voluntarily left in separate vehicles, noting they would be back.

Approximately six or seven minutes later, Medina did return in his vehicle. During that break, appellant had gone into his back yard, retrieved a firearm, and returned to a place in front of Gonzalez's home. Medina parked in front of Gonzalez's home and appeared to be upset.

At this point, appellant approached Medina's vehicle and exchanged words with him. Appellant was first to speak, telling Medina to "get the fuck out of here," although Medina may have been the first to raise his voice. Medina then began to open the door to his truck and simultaneously reached for an unknown object that appellant believed was a gun. Appellant responded by shooting Medina once in the chest. Appellant then ordered Villareal to assist him in loading Medina's body into the truck and set off to dispose of the body.

15.

Notably, appellant testified that he believed Medina was reaching for a gun and appellant feared Medina would shoot appellant. Appellant testified he was specifically scared by Medina's decision to exit the truck and reach for what appellant perceived was a gun, resulting in a belief his life was in danger and that he had to shoot Medina to survive the encounter. Appellant also admitted to calling Medina a "motherfucker" and telling him to "get the fuck out of here."

In arguing a heat of passion theory instruction was required in this case, appellant focuses on three cases discussing the objective and subjective components of the heat of passion theory: *People v. Dominguez* (2021) 66 Cal.App.5th 163 (*Dominguez*); *People v. Millbrook* (2014) 222 Cal.App.4th 1122 (*Millbrook*); and *People v. Thomas* (2013) 218 Cal.App.4th 630 (*Thomas*). In each of these cases, the Court of Appeal found that a voluntary manslaughter instruction based on a heat of passion theory was warranted under the facts of the case.

*Dominguez* involved a shooting involving rival members of two gangs who had a history of animosity. (*Dominguez, supra*, 66 Cal.App.5th at pp. 169–171.) The case focused upon a five-minute interaction that occurred in and around a narrow alley. (*Id.* at pp. 171–173.) The People's theory was that the shooting occurred as part of a planned ambush of rival gang members. They introduced evidence that there were no words exchanged before the shooting and noted that two individuals fired 21 shots in less than four seconds. (*Id.* at p. 173.) In contrast, the defendants in the case argued they had taken a shortcut when walking home and inadvertently ran into the victim. (*Id.* at p. 173.) They claimed that when they ran into the victim, he asked, "Where the fuck you from?" and reached for a weapon in his waistband. (*Id.* at pp. 173–174.) Having been attacked by gang members in a similar manner before, the defendants claimed they were scared, closed their eyes, and fired indiscriminately in response. (*Id.* at p. 174.)

Focusing on the meaning "Where you from?" has to gang members, the Court of Appeal found evidence of provocation relevant to the objective component in the victim's

statement and potential attempt to pull a weapon from his waistband. (*Dominguez, supra*, 66 Cal.App.5th at pp. 176–178.) For the subjective component, the court relied on the defendants' statements of fear and evidence indicating the number of shots fired were too great, and in too short of a time, to involve aiming. (*Id.* at p. 180.) The court specifically differentiated cases where there was no verbal provocation, the words used did not have substantial meaning to the shooter, or the words were not accompanied by physical action when discussing the objective component. (*Id.* at pp. 178–179.) The court also distinguished cases where the only evidence was the claim the victim grabbed a nearby gun, noting that in those limited circumstances, only a self-defense theory would warrant additional instructions. (*Id.* at pp. 182–183.)

In *Millbrook*, the relevant shooting occurred after an argument between guests at a birthday party. (*Millbrook, supra*, 222 Cal.App.4th at p. 1127.) The victim got into an "increasingly angry and loud" argument with another guest—the girlfriend of the defendant—in the kitchen of the home where the party was occurring, followed shortly thereafter by another argument with a different guest who had questioned his behavior. (*Id.* at pp. 1129–1130.) The defendant later confronted the victim about the argument, and the defendant, the victim, and the girlfriend got into a yelling match that witnesses tried to break apart, believing a fight was inevitable. (*Id.* at p. 1131.) Although the fight briefly subsided, it did not end. At one point, the victim told the defendant, "[B]etter check your bitch," to which the defendant responded by pulling out a gun and shooting the victim. (*Id.* at pp. 1133–1134.) The defendant claimed he had felt threatened, in part based on past issues with others who had shot at him, in part because he believed the victim had pulled a gun on him, and in part because of the setting of the party generally. (*Id.* at pp. 1132–1135.)

The Court of Appeal found that the trial court had a sua sponte duty to give a heat of passion instruction under the facts of the case. (*Millbrook, supra*, 222 Cal.App.4th at p. 1137.) Looking at the objective component, the court identified two theories under

17.

which the evidence was sufficient to support an instruction. First, the court identified evidence of the victim's treatment of the defendant's girlfriend and the related insults just before the shooting. Second, the court identified evidence of the victim's other belligerent and threatening behavior, including his escalation of the argument with the defendant, the claim he reached for a gun, and the intervention of his friends to calm him as sufficient for a jury to find provocation. (*Id.* at p. 1141.) Considering the subjective component, the court focused on the defendant claiming he felt scared and panicked while trying not to be a victim again, identifying as supporting evidence nearly all aspects of the evening. (*Id.* at pp. 1139–1140.) Notably, the court found the evidence sufficient even though it contradicted the defendant's claimed reason for the shooting. (*Ibid.*) The court also found its conclusion in line with other cases where the instruction was proper, including a case where a father defended his daughter after a road confrontation led to a verbal altercation and the other case relied upon by appellant, *Thomas*. (*Id.* at pp. 1141–1142.)

*Thomas* involved a shooting that arose out of a recurring parking dispute between residents at an apartment complex. (*Thomas, supra*, 218 Cal.App.4th at p. 634.) According to the People, after the defendant again parked his car in a manner that blocked another vehicle, he and the victim's friends got in a " 'pretty heated' " verbal argument. (*Id.* at pp. 634–635.) The argument briefly cooled, but then quickly escalated to a physical altercation in which the defendant was body slammed and struck multiple times. (*Id.* at p. 635.) The defendant fled a short distance away, crying and upset. He was soon approached by his father, who tried to calm him down. This did not work, and the defendant pushed his father away and shot the victim. (*Id.* at pp. 635–636.)

The defendant presented a different story, claiming there were no longstanding parking disputes and that he had tried to helpfully move his car when asked the day of the incident, but reparked when the victim did not leave as expected. (*Thomas, supra*, 218 Cal.App.4th at pp. 637–639.) The defendant claimed he was confronted and beaten

18.

for reparking his car. The defendant was able to flee to his car and obtain a rifle, which he used to hold off the attackers until his father arrived. (*Id.* at pp. 639–640.) The defendant alleged that the victim lunged at him while he was with his father, he did not consciously shoot, but he was afraid of being injured or killed and felt he had no choice but to shoot. (*Id.* at p. 640.)

The defendant requested, but was denied, an instruction on provocation based on a heat of passion theory. (*Thomas, supra*, 218 Cal.App.4th at pp. 644–645.) The Court of Appeal found this was improper. Focusing on the overall facts, the court noted the existence of a physical altercation, a pretty heated argument, and the fact the defendant was seen crying, calling out for his father, and possibly being dragged across a parking lot. In this context, the defendant claimed the victim then lunged at him and that the defendant thought the victim was going for his gun. The defendant further claimed he was "afraid, nervous," "not thinking clearly," and did not intend to fire. (*Id.* at p. 645.) Although the defendant's testimony was self-serving and "fit more precisely with a homicide mitigated by imperfect self-defense," the court could not rule out that the facts may also have showed voluntary manslaughter due to the defendant shooting when "his passion was aroused and his reason was obscured due to a sudden quarrel." (*Ibid.*)

Upon review of the facts of this case and the facts of those cases in which an instruction was deemed necessary, we do not find that appellant was entitled to the requested instruction. Although there are some similarities between this case and those cited by appellant, there are also substantial differences. These differences lead this court to conclude that the evidence was not sufficient for a reasonable jury to conclude that appellant was provoked by Medina in such a manner that he acted under a strong passion and not through reason. More specifically, this court concludes that Medina's act of exiting the truck and reaching for something was not sufficient evidence of provocation to support the objective component of the heat of passion theory, and his self-defense-

19.

based fear for his life was not sufficient to support the subjective component of the theory.

As appellant notes, there are several similarities between the cases he cites and the facts in this case. In *Dominguez*, for instance, the defendants' claim that they thought a weapon was being pulled supported giving the heat of passion theory instruction. And, in *Thomas*, a lunge perceived as threatening was one fact supporting the court's conclusion. Similarly, in both *Millbrook* and *Thomas*, ongoing disputes cooled before being reignited, yet the instruction was still warranted.

Despite these similarities, several differences also exist. In *Dominguez*, for example, the perceived pulling of a weapon was accompanied by a clearly gang-affiliated question that indicated a clear and present threat. In *Millbrook* and *Thomas*, there were direct and timely physical confrontations between the defendants and the victims and additional confrontations between the victims and close relatives or significant others of the defendants. Thus, in these cases, the overarching view of the facts indicate an immediate and direct threat occurring as part of a confrontation directed at the defendants, which a jury could deem sufficient to instill in the defendants a strong passion.

The facts in this case do not reach the same level. Notably, although generally focusing on the moment Medina opened his truck door and purportedly reached for a gun, appellant contends that a general state of fear existed from the point Medina first showed his gun to appellant until the moment appellant shot Medina. Unlike the cases cited by appellant, however, the facts indicating this act constituted sufficient provocation for a jury to conclude a reasonable person would be swayed by passion are not substantial. While appellant was aware of threats made by Medina, appellant's prior interactions with Medina show that Medina's anger was neither indiscriminate nor directed upon appellant. Rather, Medina's conduct was directed toward settling a dispute

20.

with Gonzalez. Even when Medina indicated he was armed, he did so in the context of making threats related to his dispute with Gonzalez.

In this context, appellant's conduct does not support a claim the provocation induced by Medina would or did trigger a heat of passion response. Rather, the evidence shows that appellant was an ancillary participant in a dispute between Medina and Gonzalez. After being included in that dispute, appellant did not retreat to a safe place, but rather chose to arm himself and return to a place outside of Gonzalez's home. In contrast to other cases where individuals found themselves in confrontations from which they could not escape, appellant further embedded himself in the confrontation by directly approaching Medina and escalating the situation when Medina returned to Gonzalez's home.

These facts all differentiate this case from those cited by appellant. There was no physical attack on appellant and no meaningful direct threats to appellant or those closest to him.[4] There was time in which any prior provocation could have cooled, yet during that time appellant acted to escalate the danger by arming himself and then instigating a confrontation. There was no substantial evidence that during this time appellant was acting under intense emotion—such as in *Thomas*, where the defendant was crying and calling out for help—and appellant himself noted he fired in direct response to a belief his life was in danger. (See *Moye, supra*, 47 Cal.4th at p. 554 [noting the defendant's testimony was exclusively consistent with acting in self-defense].) And after the shooting, rather than act as if excited by passion, appellant immediately worked to collect and dispose of Medina's body and truck. Under these facts, no reasonable jury could conclude that appellant was or believed he had been provoked by Medina in a manner

---

[4] Appellant also argues that his child lived in Gonzalez's home, implying the threats against Gonzalez should be treated as threats against appellant's close relative. However, the record shows that appellant's child was not home at the time, and there is little objective evidence in the record that appellant was in fact fearful of harm to his child.

21.

that would or did cause appellant to act under a strong emotion when Medina attempted to exit his vehicle and grabbed an object in response to appellant telling him to leave the area.

Ultimately, appellant's evidence points to a claim of self-defense or imperfect self-defense, not one indicating a heat of passion killing. In such circumstances, there is no obligation to provide a heat of passion instruction. (*Moye, supra*, 47 Cal.4th at p. 555 [noting a heat of passion instruction is not required where the only evidence of unreasonable self-defense is the circumstance that a defendant is attacked and consequently fears for his life].) The evidence here was insufficient to warrant the requested instruction, and no error arose when the court denied the request. (See *ibid.*)

We briefly add that even if an error was found, we would not find prejudice. "[N]o 'rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error.]' " (*People v. Schuller* (2023) 15 Cal.5th 237, 244, first bracketed insertion added.) As appellant's basis for finding provocation in this case nearly perfectly parallels the imperfect self-defense claim rejected by the jury, no rational juror could have relied on that same rejected evidence of threatening conduct amounting to an actual belief of an imminent danger of harm to find provocation that would have affected a person of average disposition to act out of passion had the heat of passion instruction been given. (See *Moye, supra*, 47 Cal.4th at p. 557 ["the jury having rejected the factual basis for the claims of reasonable and unreasonable self-defense, it is not reasonably probable the jury would have found the requisite *objective* component of a heat of passion defense (legally sufficient provocation) even had it been instructed on that theory of voluntary manslaughter"].)[5]

---

[5] *Moye* applied the state law standard for harmless error, not the federal standard now employed for such issues. (Compare *Moye, supra*, 47 Cal.4th at p. 558, fn. 5 [noting Justice Kennard's dissenting position that the federal standard should apply for errors of this nature]

This is so even under appellant's broadest theory for a heat of passion voluntary manslaughter instruction—provocation shown by fear for himself and others occurring and continuing from the moment Medina showed a weapon until the moment Medina was killed—because even this theory requires a conclusion that both appellant and a reasonable person would have been provoked by Medina's general course of conduct. The jury's verdict, however, rejected any claim that appellant believed he was in imminent danger and that the use of deadly force was necessary to defend against such danger based on that same conduct. If the jury could not find appellant unreasonably believed he was in such imminent danger that force was needed from any of the conduct alleged, the claim he or a reasonable person would have been provoked to act under the influence of intense emotion due to fear arising from the same conduct fails.

### *Evidentiary Objections*

Appellant contends in his third substantive argument that certain evidence he attempted to elicit at trial was improperly and prejudicially excluded as hearsay. Appellant identifies three general groupings where this occurred and argues each from an independent and cumulative error position. We therefore recount the evidence related to these groupings and consider them in the same context argued by appellant.

*Additional Relevant Facts*

During the course of the trial, appellant sought to introduce several different statements, each of which was denied on hearsay grounds. As noted, on appeal, appellant considers these statements in three unique groupings.

The first grouping contains statements proffered during Villarreal's testimony and related to a discussion Villarreal had with appellant just before the shooting. Appellant's

---

with *People v. Schuller, supra*, 15 Cal.5th at p. 260, fn. 7 [adopting the federal standard of review for all forms of voluntary manslaughter based on the unique relationship between murder and voluntary manslaughter].) We recognize this change in the law and apply the federal standard here, only noting the persuasive nature of *Moye* in the context of cases where the provocation and imperfect self-defense facts overlap in a meaningful way.

counsel was able to elicit testimony from Villarreal that appellant was stressed out and upset during the conversation. However, when counsel sought to elicit statements from appellant to Villarreal that appellant "just had a firearm pulled on him," "[s]omebody was trying to kill" appellant, and appellant's statements related to "something that had just happened," the trial court sustained hearsay objections to each effort.

Appellant argued that these statements were admissible under the spontaneous statement exception to the hearsay rule and asserted that if permitted, Villarreal would testify that appellant stated that "two people pulled firearms on him" and "he thought he was going to be killed." Finding that appellant's statements would have been "highly motivated" to support his case, the trial court rejected these arguments and excluded the statements.

The second grouping contains statements again proffered during Villarreal's testimony but related to a discussion Villarreal had with appellant after the shooting. As before, appellant's counsel was able to elicit testimony from Villarreal that appellant was stressed out immediately after the shooting and during the time appellant had Villarreal assist with Medina's body. However, when counsel asked if appellant stated he thought he was going to be killed during that time, the trial court sustained a hearsay objection.

Appellant provided an offer of proof that, if permitted, Villarreal would testify to appellant stating that "he believed that he was going to be killed," "he acted in self-defense," and "he felt as if it was his life or … Medina's life" at the time of the shooting. Appellant argued the statements were admissible both under the spontaneous statement exception to the hearsay rule and under Evidence Code section 356 as a statement needed to complete previous testimony regarding the movement of Medina's body. Argued to the court at the same time and in the same manner as the pre-shooting statements, the trial court rejected the arguments on both grounds and excluded the statements.

The third grouping contained statements made by Gonzalez to a police detective that related to when he first heard appellant raise a self-defense claim. When called to

24.

testify regarding conversations he had with appellant, Gonzalez indicated he first heard details about the shooting a couple of weeks after it happened and denied he heard any details from appellant on the day of the shooting. During subsequent cross-examination of a police detective that had spoken with Gonzalez, appellant sought to elicit evidence that Gonzalez reported to the officer that appellant had provided details about the shooting immediately after the shooting occurred. The trial court excluded the statements as hearsay and outside the scope of direct. In further, unsuccessful argument, appellant contended the statements were also admissible as prior inconsistent statements and under Evidence Code section 356.

*Standard of Review and Applicable Law*

"A core premise of evidence law is that not all statements are created equal. The hearsay label applies to an out-of-court statement offered to prove that its assertion is true. (Evid. Code, § 1200, subd. (a).) A familiar feature of the law of evidence, in California and beyond its borders, is that hearsay is generally inadmissible unless it falls under a specific exception that justifies its admission. (*Id.*, subd. (b).)" (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 192.)

"Under the exception to the hearsay rule for spontaneous statements, a trial court may admit evidence of a statement that '[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant,' if the statement '[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception.' (Evid. Code, § 1240.) For a statement to be admissible under this exception, ' "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been [made] before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' " (*People v. Lozano* (2024) 101 Cal.App.5th 366, 376.)

" 'A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was "time to contrive and misrepresent." [Citation.] Such factors include the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication. [Citations.] This court has observed, however, that these factors "may be important, but solely as an indicator of the mental state of the declarant." [Citation.] For this reason, no one factor or combination of factors is dispositive.' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 40.)

The rule of completeness is embodied in Evidence Code section 356, which "provides that if part of an act, conversation, declaration, or writing is placed in evidence, the adverse party may inquire into 'the whole *on the same subject*.' (Italics added.) The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission … in evidence.' " (*People v. Arias* (1996) 13 Cal.4th 92, 156, fn. omitted.)

" 'In determining the admissibility of evidence, the trial court has broad discretion.… A trial court's ruling on admissibility implies whatever finding of fact is prerequisite thereto ….' [Citation.] 'We review the trial court's conclusions regarding foundational facts for substantial evidence. [Citation.] We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 320–

321, first bracketed insertion added.)  Moreover, " '[t]o the extent an alleged error violates state evidentiary law, "even where evidence is improperly excluded, the error is not reversible unless ' "it is reasonably probable a result more favorable to the appellant would have been reached absent the error." ' " ' " (*In re A.S.* (2018) 28 Cal.App.5th 131, 155.)

*The First Grouping, Pre-shooting Statements*

Appellant argues that the first grouping of statements, those made to Villarreal prior to the shooting, were admissible under the spontaneous statement exception to the hearsay rule.  As noted, the trial court excluded these statements because it found the defendant was highly motivated to make a self-serving statement at that time, precluding application of the exception.  We do not find this to be an abuse of discretion.

Appellant argues that the statement should have been admitted because there was a startling occurrence, appellant made his statements before there was time to contrive or misrepresent, and the statements generally described the event.  The trial court's ruling focuses on the court's impression that "[t]he reflection time" was "the big issue" in resolving much of the dispute.  This aspect of the analysis corresponds to the requirement that the statement be made without the opportunity to contrive and misrepresent in one's statements.  In this area, we find the court's decision falls within its discretion.

The facts known about the pre-shooting statements at the time the court made its ruling were fairly limited.  Villarreal's testimony was that he saw appellant at some point after appellant had first interacted with Medina and Real.  At the time, Villarreal was leaving his house and heading to the Market.  Appellant appeared upset, stressed out, and as if he was bothered by something.  Appellant then made his statements without any questioning from Villarreal.

Under these facts, the court could within its discretion decline to apply the exception.  There is no real argument that the statement generally narrated what had happened and that appellant appeared to be under some form of stress at the time he made

27.

the statement. However, the record does not show a lack of opportunity for appellant to reflect in order to contrive a story or misrepresent the situation. Villarreal was not present at the moment appellant, Medina, and Real interacted. And there is no question that some period of time passed in which that interaction concluded, Medina and Real left the scene, and appellant then headed toward his grandfather's house before making the statements to Villarreal.[6] Although the facts could have also supported admission, the court acted within its discretion when it determined that the statements were inadmissible because they were not made before there had been time to contrive and misrepresent and therefore did not meet the exception. The lack of a contemporaneous statement and only minimal evidence upon which one could conclude appellant was still acting under such extreme stress that his ability to reflect was compromised was a sufficient basis for the court to exclude the statements.

*The Second Grouping, Post-shooting Statements*

Appellant next contends that the post-shooting statements made to Villarreal were also admissible, both under the spontaneous statement exception and under the rule of completeness. We again find no abuse of discretion.

Appellant's statements arose shortly after the shooting occurred. According to Villarreal, he heard a "pop," froze, and saw Medina's body fall to the floor. After this happened, appellant got into Medina's truck, drove it so that it could be turned around, got out, and told Villarreal to help put Medina's body into the truck. Appellant had to request help multiple times because Villarreal was "just stuck." At some point shortly after this, appellant allegedly made the statement he had feared for his life. During this time, Villarreal described appellant as still appearing stressed out.

---

[6]     Additional facts developed in appellant's own testimony showed that he had completed the interaction with Medina and Real, successfully convincing them he was seeking out Gonzalez, walked to the backyard of his grandfather's home to retrieve a gun that he had previously hidden there, and had then returned to the front yard by the time he encountered Villarreal and made the purportedly spontaneous statements.

As with the pre-shooting statements, under these facts the trial court acted within its discretion in excluding the statements. Although the evidence presented could be interpreted to support admission, it again does not compel the conclusion that there was no opportunity for appellant to reflect in order to contrive a story or misrepresent the situation. Although acting under some level of stress, appellant was able to compose himself sufficiently to begin to collect and move Medina's body, entering Medina's truck, moving it, and asking Villarreal for help multiple times. The evidence is sufficient to support the trial court's conclusion that appellant had sufficient opportunity to contrive a story and misrepresent the situation such that the exception to the hearsay rule would not apply.

Similarly, we find no error in rejecting admission under the rule of completeness. The rule of completeness exists to avoid creating a misleading impression through the selective introduction of only part of a piece of evidence. (*People v. Arias, supra*, 13 Cal.4th at p. 156.) Accordingly, to be admissible, appellant's statements that he acted in self-defense needed to be at least reasonably related to the statement admitted, his instruction to Villarreal to help move Medina's body. Appellant claims this connection exists because the additional statements about self-defense allow one to understand, in context, the statement made to Villarreal as part of a general response to a stressful event and not as part of a plan to murder Medina. But the statement admitted does not necessarily imply that appellant had a predetermined plan to murder Medina. Rather, the statement only includes a request for help to move the body. Whether that was to hide the body, bring Medina to a hospital, or as part of a general response to a stressful and unexpected event, there is no reasonable probability of a misleading impression through the admission of the statement requesting help. Accordingly, we do not conclude the trial court abused its discretion in rejecting the argument that completeness required admitting evidence of the motive for the shooting to explain the request to help move Medina's body.

29.

*The Third Grouping, Gonzalez's Statements*

Appellant's third grouping relates to efforts to demonstrate appellant had asserted self-defense as a motive when speaking to Gonzalez immediately after the shooting, rather than several weeks later as Gonzalez testified. According to appellant, Gonzalez told a detective that appellant made statements indicating the shooting was in self-defense on the night of the shooting. Appellant contends these statements were admissible as evidence of prior statements inconsistent with Gonzalez's trial testimony and under the rule of completeness. The People contend the evidence was properly excluded as outside the scope of direct examination, and any argument relying only on the hearsay portion of the ruling has not been properly supported.

We reject the People's contention that this argument has not been properly supported.[7] However, even assuming that the trial court erred by excluding the evidence, we find any error was harmless. The primary impact of the excluded testimony was to move the date at which appellant allegedly claimed self-defense from a couple of weeks after the murder to the night of the murder. Appellant argues that this evidence would have undercut the prosecutor's theory that the shooting was not in self-defense and that appellant's claim is a belatedly concocted defense. However, the jury was presented with multiple pieces of evidence supporting the self-defense theory, including evidence of prior disputes both days before and immediately preceding the shooting, statements that Medina was carrying a weapon from appellant, Real, and Villarreal—whom the jury appears to have generally believed in light of Villareal's acquittal in the same trial—and appellant's own testimony regarding the basis for his conduct. In opposition, the jury was presented with evidence from eyewitnesses regarding the shooting as well as the

---

[7] In reply, appellant notes the argument was supported by citation to the record, pointing to evidence showing the trial court rejected appellant's reconsideration request to admit the evidence after appellant indicated a desire to reopen testimony to properly introduce the evidence.

30.

circumstances under which Medina's body and truck were discarded to discredit a self-defense theory.

The jury rejected both an absolute and an imperfect self-defense claim in reaching its guilty verdict on the second degree murder charge. In light of the jury's determination under the full scope of evidence admitted that even though Medina was armed, appellant's self-defense arguments were inadequate, we find no reasonable probability that the jury would have reached a more favorable verdict for appellant had it come to light that appellant told Gonzalez he shot in self-defense the night of the shooting, rather than roughly two-weeks later. (See *In re A.S., supra*, 28 Cal.App.5th at p. 155; *People v. Price* (1991) 1 Cal.4th 324, 411–412 [no prejudicial error when documents discussed but not admitted].) Further, having found only a single nonprejudicial error, we also reject appellant's arguments for reversal based on cumulative error. (See *People v. Hughes* (2002) 27 Cal.4th 287, 406–407 [no cumulative error found when only possibly significant error did not warrant reversal].)

### *Custody Credit Correction*

In a brief conceded argument, appellant notes that he was granted 698 actual days of presentence custody credit but was entitled to 699 actual days of credit. The credit had been calculated between appellant's arrest, identified as May 21, and appellant's sentencing, identified as April 18, 2023. However, testimony at trial showed appellant was arrested on May 20. The People agree that an additional day of credit is warranted and that we have the authority to correct this error. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.) Finding no reason to reject this concession in light of the testimony regarding appellant's arrest and booking, we agree appellant should have received 699 actual days of presentence custody credit.

### DISPOSITION

The judgment is amended to reflect an award of 699 days of presentence custody credit. The clerk of the superior court shall prepare an amended abstract of judgment and

forward a certified copy to the Department of Corrections and Rehabilitation. In all other aspects, the judgment is affirmed.


                                                          HILL, P. J.

WE CONCUR:


SMITH, J.


FAIN, J.*

---

*       Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.